GARWOOD, Circuit Judge:
 

 In this case, we examine the
 
 res judicata
 
 effect of the sale of property authorized by a federal district court under Chapter 10 of the Bankruptcy Act.
 
 [1]
 

 I.
 

 FACTS
 

 Appellant The Charles House Corporation developed and built a residential real estate development in New Orleans, Louisiana known as The Charles House. Appellant David F. Craig, Sr. (Craig) is president and a twenty-five percent stockholder of the corporation.
 
 [2]
 
 Appellee Southmark Properties (Southmark), formerly Citizens & Southern Realty Investors, was a real estate investment trust engaged in, among other things, financing the construction of residential real estate developments.
 

 In 1972, Craig sought and received from Southmark a loan to finance construction of The Charles House. The loan was executed in December 1972, and was secured by a collateral mortgage on the project, a
 
 *866
 
 $1.75 million collateral mortgage note, and the personal guaranties of Craig, Flotte, and Daniel, all dated December 6, 1972. Although the collateral mortgage note, which was payable on demand, specified an interest rate of twelve percent per annum, the mortgage specified that Southmark possessed the right “to issue and re-issue the said note from time to time, as mortgagor’s interest and/or convenience may require.” “Hand notes” signed by The Charles House Corporation, by Craig, upon each disbursement of loan funds, each specified an interest rate of four and one-half percentage points per annum above the best commercial lending rate at Citizens & Southern Bank, “as said rate may change from time to time.”
 
 [3]
 
 Each hand note reflected that it was secured by the mortgage and provided for a maturity of December 6, 1979, subject to acceleration in the event of default in any of the note payments or under the mortgage. The hand notes were guaranteed by Craig, Flotte, and Daniel. The first hand note was in the amount of $625,205.99 and was executed December 6, 1972. The collateral mortgage required in part that The Charles House Corporation “pay promptly at maturity all payments due on the Note,” “pay and discharge, promptly when due, all taxes” and “not ... encumber the aforesaid property to the prejudice of this act.” The mortgage stipulated that breach of the above obligations constituted default allowing the lender to declare the entire indebtedness “immediately due and payable” and to seize and sell the property under execu-tory process. Each of the hand notes stipulated that “[ijnterest ... shall be payable monthly.”
 

 Craig and Southmark agreed that $192,-000 of the authorized loan amount would serve as an “interest reserve” fund. The fund was not referred to in any of the loan documents, but was listed in a pro forma statement itemizing the anticipated allocation of the loan proceeds. The parties anticipated that the reserve fund would be sufficient to pay the interest due on the loan at least until the completion of the project. Interest rates, however, rose dramatically after commencement of The Charles House construction,
 
 [4]
 
 “depleting” the interest reserve faster than anyone had anticipated. The interest reserve was “exhausted” by August 1974. Although The Charles House Corporation, through Craig, at that time requested and received from Southmark an additional $100,000 loan, $45,000 of which was used to pay accrued interest, no further interest payments were made.
 

 In April 1975, after The Charles House Corporation had failed to pay interest on its loan for approximately eight months, and failed to pay local taxes due in January 1975, and after approximately $106,000 in construction liens had been filed against the project, Southmark initiated proceedings in Louisiana state court to foreclose its mortgage on The Charles House property. Southmark also filed suit against the loan guarantors in state court to recover any deficiency due it beyond that covered by proceeds from the foreclosure sale. On the scheduled date of the foreclosure sale of The Charles House property, three unsecured creditors of The Charles House Corporation filed a Chapter 10 reorganization petition against the corporation in United States District Court for the Eastern District of Louisiana. The Charles House Corporation admitted the petition’s allegations and acquiesced in the reorganization proceedings. The district court enjoined completion of the state foreclosure proceedings. After unsuccessfully seeking dismissal of the reorganization petition in the district court, and filing an appeal from the district court’s refusal to dismiss, South-
 
 *867
 
 mark asserted, without opposition, a claim as a secured creditor in the reorganization proceedings. The claim was later accepted by the trustee and the district court.
 

 While the reorganization proceeding was in progress, The Charles House Corporation, through Craig, with the concurrence of Flotte and Daniel, reached an agreement with Southmark to allow Southmark to bid on The Charles House property in a reorganization trustee’s sale. In return for Craig’s and The Charles House Corporation’s promise not to oppose such a sale, Southmark agreed to dismiss its state court suits against the corporation and the guarantors, and to dismiss its appeal challenging the reorganization proceedings. Pursuant to a petition from the reorganization trustee, the district court ordered that The Charles House property be sold at public auction, and that Southmark be allowed to bid the balance due on its mortgage debt. The order provided that the property “shall be sold free and clear of all ... claims.” The property was sold at auction in November 1976 to Southmark, the only bidder, which bid the amount of its debt, surrendered its mortgage on the property, and took title and ownership of it. The sale was confirmed by an order of the district court on December 8, 1976. In accordance with its agreement with Craig, Southmark dismissed its state court actions against The Charles House Corporation, Craig, Flotte, and Daniel with prejudice and dismissed its appeal challenging the reorganization proceedings. Because the reorganization sale had disposed of the only asset of The Charles House Corporation, the reorganization petition was dismissed by the district court upon a motion of the trustee in early 1978. No appeals were taken from the order directing the sale, or that confirming it, or the 1978 order dismissing the reorganization.
 

 In October 1981, The Charles House Corporation filed suit in Louisiana state court against both Southmark and St. Charles Avenue, Inc., a wholly owned subsidiary of Southmark which had acquired ownership of The Charles House property from South-mark sometime after the reorganization sale. The suit alleged that Southmark had violated its construction loan agreement with The Charles House Corporation by engaging in fraudulent and extortionate activities leading to and including the initiation of the April 1975 foreclosure proceedings and the subsequent reorganization sale. The complaint also alleged that ap-pellees had violated implicit provisions in the loan agreement with The Charles House Corporation, including the responsibility to perform the contract “in good faith.”
 
 [5]
 
 The Charles House Corporation prayed for monetary damages and other relief including an amount equal to all rents, profits, and income derived from the property by appellees. Southmark subsequently filed suit in United States District Court for the Eastern District of Louisiana requesting declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C.
 
 *868
 
 §§ 2201,
 
 et seq.,
 
 that “its purchase of The Charles House was valid and that The Charles House Corporation has no valid claim against [appellees] arising out of” the reorganization sale. Appellees also asked the court to enjoin The Charles House Corporation from prosecuting pending or future claims against them predicated on actions arising from the trustee’s sale. Appellant The Charles House Corporation filed a motion to dismiss based in part on the anti-injunction act, 28 U.S.C. § 2283, and subsequently, joined by Craig, filed a counterclaim which was substantially identical to The Charles House Corporation’s state court claim.
 
 [6]
 

 Following the filing of two motions for summary judgment by appellees, and various depositions and affidavits, the district court granted summary judgment to appel-lees and dismissed the counterclaim, without further elaboration.
 
 [7]
 

 Although appellees advance several grounds in support of the district court’s judgment, we need reach only one. We hold that appellants’ counterclaim is barred by the doctrine of
 
 res judicata,
 
 and that appellees are entitled to declaratory relief to that effect. We therefore affirm the grant of summary judgment and dismissal of the counterclaim.
 

 II.
 

 FEDERAL JURISDICTION
 

 Appellants assert that federal jurisdiction is lacking in this suit. It is well settled, however, that a district court possesses ancillary jurisdiction “to secure or preserve the fruits and advantages of a judgment or decree rendered” by that court.
 
 Local Loan Co. v. Hunt,
 
 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934), quoted in
 
 Matter of Mooney Aircraft, Inc.,
 
 730 F.2d 367, 374 (5th Cir.1984). This is such a case. If The Charles House Corporation were successful in its state court action, the district court judgment authorizing and confirming the sale of The Charles House to Southmark free and clear of any claims, and allowing Southmark to bid on its debt, would be effectively nullified.
 
 See Miller v. Meinhard-Commercial Corporation,
 
 462 F.2d 358 (5th Cir.1972);
 
 Samuel C. Ennis & Co., Inc. v. Woodmar Realty Co.,
 
 542 F.2d 45, 48-49 (7th Cir.1976),
 
 cert. denied,
 
 429 U.S. 1096, 97 S.Ct. 1112, 51 L.Ed.2d 543 (1977).
 

 Appellants insist that because they seek only monetary relief and do not challenge the transfer of title of The Charles House property to Southmark,
 
 [8]
 
 their claim does
 
 *869
 
 not disturb the earlier judgment. They argue that the reorganization sale was merely incidental to Southmark’s allegedly fraudulent and bad faith scheme to violate the loan agreement and seize The Charles House. We are convinced, however, that “[tjhis suit would do everything that [ap-pellees] say[ ] it does not.”
 
 Miller
 
 at 360. Appellants’ state court action and related counterclaim are nothing more than not-so-thinly veiled attacks on the prior reorganization orders. Critical to appellants’ claims is their assertion that Southmark improperly assumed ownership of The Charles House by way of the trustee’s sale. Appellants themselves note in their counterclaim that the purpose and effect of the alleged improper scheme engaged in by Southmark was to seize The Charles House and convert its “equity, rents, and profits” to its own use.. Notwithstanding appellants’ protestations to the contrary, it is obvious that their state court suit attempts — by seeking to strip Southmark and its successor in title of any benefits received as a result of the reorganization sale — to effectively nullify that sale and the determination that the mortgage debt, which Southmark was allowed to bid in, was owing to it. The fact that the suit “is brought under a different label in an independent action cannot camouflage its inevitable effect.”
 
 Miller
 
 at 361. Thus, the district court had jurisdiction over this suit.
 

 The district court also properly assumed jurisdiction over appellants’ counterclaim.
 
 See Bankers Mortgage Company v. United States,
 
 423 F.2d 73, 78-79 (5th Cir.),
 
 cert. denied,
 
 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 793 (1970).
 

 III.
 

 RES JUDICATA
 

 We are equally convinced that the judgment of the district court ordering and confirming the sale and transfer of title of the property to Southmark are
 
 res judicata
 
 as to the claims asserted by appellants. The test in this Circuit for determining whether a claim is barred by the doctrine of
 
 res judicata
 
 is as follows:
 

 “ ‘For a prior judgment to bar an action on the basis of
 
 res judicata,
 
 the parties must be identical in both suits, the prior judgment must have been rendered by a court of competent jurisdiction, there must have been a final judgment on the merits and the same cause of action must be involved in both cases.’ ”
 
 Nilsen v. City of Moss Point, Miss.,
 
 701 F.2d 556, 559 (5th Cir.1983) (en banc), quoting
 
 Kemp v. Birmingham News Co.,
 
 608 F.2d 1049, 1052 (5th Cir.1979).
 

 Res judicata
 
 principles apply with full force to orders rendered by a district court pursuant to Chapter 10 of the Bankruptcy Act. IB J. Moore,
 
 Moore’s Federal Practice
 
 (hereinafter cited as
 
 “Moore’s”)
 
 If 0.419[3.-1] (2d ed. 1983).
 
 See In re Atlas Sewing Centers, Inc.,
 
 437 F.2d 607 (5th Cir.1971).
 

 The general rule is
 

 “... that for purposes of the conventional statement that a judgment binds the ‘parties’ to the action, the word ‘parties’ does not refer to formal or paper parties, but to parties in interest, that is, that persons whose interests are properly placed before the court by someone with standing to represent them are bound by the matters determined in the proceeding.” IB
 
 Moore’s
 
 If 0.411[1] at 390-91.
 

 Southmark, St. Charles Avenue, Inc., The Charles House Corporation, and Craig as president and a stockholder of appellant corporation, were all “parties in interest” to the prior reorganization orders, and thus are bound by them.
 
 See
 
 11 U.S.C. §§ 567, 606. 5
 
 Collier on Bankruptcy
 
 II 1109.02[2] (15th ed. 1983); IB
 
 Moore’s
 
 1I0.411[1].
 

 Although appellants assert that Craig was not a party to the reorganization proceedings, and the record does not indicate that he formally intervened on his own behalf in the proceedings, Craig — as a stockholder of the debtor corporation — possessed a statutory right to be heard “on all matters arising in” the proceedings. 11
 
 *870
 
 U.S.C. § 606. The record does show that Craig was actively involved in the reorganization proceedings. By participating in the proceedings, Craig became a party to them, regardless of whether he ever was formally named as such. 5
 
 Collier on Bankruptcy
 
 ¶ 1109.02[2] at 1109-20.
 

 Moreover, even if Craig were not a party to the reorganization proceedings, a final judgment is
 
 res judicata
 
 not only between parties to the earlier lawsuit, but also their privies.
 
 Drier v. Tarpon Oil Company,
 
 522 F.2d 199 (5th Cir.1975) (per curiam). Because Craig, as a major stockholder in appellant corporation, its president, and a guarantor on the construction loan, had a strong and direct pecuniary interest in the outcome of the reorganization proceedings, and by his own admission had and exercised substantial control over the litigation on behalf of The Charles House Corporation, he is bound by the reorganization orders.
 
 See Drier
 
 at 200;
 
 Hyman v. Regenstein,
 
 258 F.2d 502, 512 (5th Cir.1958),
 
 cert. denied,
 
 359 U.S. 913, 79 S.Ct. 589, 3 L.Ed.2d 575 (1959); IB
 
 Moore’s
 
 ¶0.411[6] at 47, 450, ¶ 0.411[10],
 

 Finally, we note that St. Charles Avenue, Inc., as Southmark’s successor in interest to the property, may assert whatever rights flowed to Southmark by way of the trustee’s sale. IB
 
 Moore’s
 
 ¶ 0.411[1] at 394.
 

 There is no real doubt that the district court possessed jurisdiction to authorize and approve a trustee’s sale.
 
 See
 
 11 U.S.C. §§ 515, 516(3).
 
 [9]
 

 That the district court’s order authorizing the sale of The Charles House property and judgment confirming the sale and passage of title to Southmark operated as “a final judgment on the merits” is evident.
 
 [10]
 

 We next determine whether the reorganization proceedings, and specifically the trustee’s sale of The Charles House property, involved the same “cause of action” or “claim”
 
 [11]
 
 now asserted by appellants in their counterclaim and state court action. We believe they did. We initially note that this Circuit has adopted the transactional test of the Restatement (Second) of Judgments
 
 [12]
 
 to determine whether two
 
 *871
 
 suits involve the same claim.
 
 Nilsen
 
 at 560;
 
 United Home Rentals v. Texas Real Estate Commission,
 
 716 F.2d 324, 328 (5th Cir.1983),
 
 cert. denied,
 
 — U.S. —, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984). The central transaction involved in both the reorganization sale and appellants’ present claim was the passing of title to and ownership of The Charles House property from The Charles House Corporation to South-mark in exchange for cancellation of the mortgage debt. Although appellants’ present claim alleges various other acts of wrongdoing by Southmark, all of those acts are alleged to have produced or resulted from, and were integrally related to, the sale of the property to Southmark. They all involved a “common nucleus of operative facts.” If appellants’ challenge to Southmark’s right to thus take ownership of the property was extinguished by the prior reorganization action, as we hold it was, then appellants’ remedies against Southmark “with respect to all or any part of the transaction, or
 
 series of connected transactions, out of which the action arose,”
 
 also were extinguished. Restatement (Second) of Judgments § 24(1) (emphasis added).
 

 Because appellants’ present claim and the prior judgment involved the same principal transaction, appellants’ claim is barred by
 
 res judicata,
 
 if the procedural system available to appellants in the reorganization proceedings permitted appellants to raise that claim in those proceedings.
 
 Nilsen
 
 at 562-63. Appellants do not assert that they lacked such an opportunity, and they clearly did not. Appellants had an “absolute and unlimited” right to be heard in the reorganization proceedings. 5
 
 Collier on Bankruptcy
 
 II 1109.02[2] at 1109-19.
 
 See
 
 11 U.S.C. § 606.
 
 [13]
 
 Indeed, under the Bankruptcy Act, a Chapter 10 debtor was obliged to
 

 “... examine and report to his trustee concerning the correctness of all proofs of claim filed against his estate ... [and] prepare ... a list of all his creditors, including all persons asserting ... disputed claims, ... the amount due to or claimed by each of them, the consideration thereof, the security held by them, if any, and what claims, if any, are ... disputed_” 11 U.S.C. § 25(a).
 

 The trustee in turn was obligated by the Act to “report to the judge any facts ascertained by him pertaining to fraud, misconduct, mismanagement and irregularities, and to any causes of action available to the estate.” 11 U.S.C. § 567. The trustee also was “required to examine all proofs of claim and interest and object to the allowance of those that may be improper.”
 
 Avery v. Fischer,
 
 360 F.2d 719, 725 (5th Cir.1966). The Act provided that upon the filing of proofs of claims of creditors, the court shall hear and summarily determine “[objections by any party in interest to the allowance of any such claims ....” 11
 
 *872
 
 U.S.C. § 596. The district court also was granted jurisdiction over all choses in action possessed by the debtor.
 
 See, e.g., Baker v. Gold Seal Liquors, Inc.,
 
 417 U.S. 467, 476, 94 S.Ct. 2504, 2510, 41 L.Ed.2d 243 (1974) (Stewart, J., concurring).
 

 If Southmark had violated the terms of its mortgage agreement with appellants, and had committed various fraudulent and unlawful acts with respect thereto, as appellants now allege, appellants had ample opportunity to raise those facts as a defense to Southmark’s claim, and to request that the trustee assert whatever cause of action the debtor possessed in that regard against Southmark. Appellants instead chose to forego any objections to the assertion of Southmark’s secured claim, or the sale of The Charles House property to Southmark. As a result, Southmark’s interest was recognized by the trustee and Southmark was allowed to bid in its mortgage debt for the property, without opposition. As the Supreme Court stated in
 
 Brown v. Felsen,
 
 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979), “[r]es judicata prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.” Appellants cannot now undo a judicial decree which they had a full opportunity to contest, and chose not to.
 

 IV.
 

 EQUITABLE RELIEF FROM JUDGMENT
 

 Although it is black letter law that a valid final judgment, even if erroneous, is not open to collateral attack, IB
 
 Moore’s
 
 110.405[4.-l], an independent action under certain circumstances may be brought for relief from a judgment based on “fraud, accident, mistake or other equitable ground .... ”
 
 Bankers Mortgage Company v. United States,
 
 423 F.2d 73, 78 (5th Cir.),
 
 cert. denied,
 
 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 793 (1970), quoting 7
 
 Moore’s
 
 ¶ 60.36.
 
 [14]
 
 Appellants assert, as they did below, that if the reorganization sale is
 
 res judicata
 
 to their counterclaim and state court claim, they should be relieved from the preclusive effects of that judgment for several equitable reasons.
 
 [15]
 

 First, appellants contend that the reorganization orders cannot preclude their present claim because the claim was not discovered until after the reorganization sale. According to appellants, South-mark’s “scheme” to acquire The Charles
 
 *873
 
 House property was not complete until St. Charles Avenue, Inc. condominiumized and sold the property at a “huge profit.” Although the condominiumization and resale of the property may have given appellants additional evidence regarding damages they may have suffered from the “scheme” and additional evidence as to appellees’ “bad faith,” it was not an essential element of appellants’ cause of action. Whatever improper actions had been performed by Southmark against appellants were completed by the removal of title in the property from The Charles House Corporation in exchange for cancellation of the mortgage debt. At that point, appellants were stripped of any rights they allege were infringed by Southmark’s actions, and appellants’ cause of action matured. Moreover, discovery of evidence not in existence at the time of an earlier judgment is not an available ground for attacking that judgment. 11 C. Wright & A. Miller,
 
 Federal Practice and Procedure: Civil
 
 § 2859 (1973).
 

 Second, appellants allege that they were the victims of duress instituted by South-mark, which forced them to acquiesce in the sale of The Charles House property to Southmark. Although appellants have not brought to our attention any decisions granting relief from a judgment on this ground, we note that at least one Circuit may have recognized duress as a basis for such relief.
 
 See Hadden v. Rumsey Products,
 
 196 F.2d 92, 96 (2d Cir.1952);
 
 Ira S. Bushey & Sons v. W.E. Hedger Transportation Corporation,
 
 167 F.2d 9, 18 (2d Cir.),
 
 cert. denied,
 
 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371 (1948).
 
 See also United States v. Throckmorton,
 
 98 U.S. 61 (8 Otto 61), 25 L.Ed. 93 (1878) (relief from judgment available where successful litigant’s actions prevented an adversary trial). Whether duress of the general kind alleged by appellants could ever suffice as a basis for relief from a judgment,
 
 cf., Ira S. Bushey & Sons,
 
 167 F.2d at 18-19, we do not decide, for we hold that no genuine fact issue was raised tending to show any character of actionable duress.
 

 Because this is an appeal from a grant of summary judgment, “we must view the evidence and any inferences to be drawn therefrom in the light most favorable” to the nonmoving party “to determine whether any genuine issue of material fact exists and whether the party seeking summary disposition is entitled to judgment as a matter of law.”
 
 Prinzi v. Keydril Co.,
 
 738 F.2d 707, 709 (5th Cir.1984).
 
 [16]
 
 Our review of the affidavits, depositions, and other evidence presented to the district court by the parties convinces us that there is “no evidence from which reasonable persons might draw” an inference that appellants were the victims of duress.
 
 Id.
 

 To demonstrate such duress, appellants rely exclusively on the deposition and affidavits of Craig. In his deposition, Craig testified that he agreed not to resist the reorganization sale of The Charles House property because of a threat made by Jerry A. Brown, Southmark’s attorney in the reorganization proceedings, in a meeting or meetings between Brown and Max Nathan. Nathan was the attorney for Craig, The Charles House Corporation, and The Charles House guarantors in those proceedings. Craig was not present at any such meetings. According to Craig, Nathan told Craig that Brown had threatened “to bring the full force and weight of [the] entire [Citizens & Southern] organization against John Elms, his two sisters, George Zissus ..., Lionel Flotte and Hartman Daniel and myself and that they would attempt to break our backs ... and ruin them.”
 
 [17]
 

 
 *874
 
 Nathan testified that the threat regarding the above-named individuals made by Brown and related by Nathan to Craig was that Southmark (then Citizens & Southern Realty Investors) would actively prosecute litigation against these individuals to enforce their guaranties on The Charles House and The Pier Eight Apartments loans if The Charles House Corporation remained in the reorganization proceedings and resisted Southmark’s foreclosure on The Charles House.
 
 [18]
 
 It is clear from Nathan’s testimony that, according to Nathan, Brown’s threat regarding Flotte, Daniel, Zissus, Elms, Elms’ sisters, and Craig was only to aggressively enforce their guaranties on The Charles House and Pier Eight loan agreements. Nathan’s version of the threat made to him by Brown was corroborated by Brown’s testimony.
 
 [19]
 
 Daniel and Flotte testified that the only threat from Brown of which they were aware was relayed to them by Craig. Daniel and Flotte testified, as did Nathan, that the threat as
 
 *875
 
 understood by them was only to fully enforce the guaranties on The Charles House and Pier Eight loans in state court.
 
 [20]
 

 We do not believe that the district court was required to give any weight, in respect to whether there was a genuine factual dispute as to what threat was actually made by Brown, to Craig’s uncorroborated testimony as to what Craig’s lawyer, Nathan, told Craig that Brown had said to Nathan. This was obviously hearsay insofar as it concerned what Brown had actually said.
 
 See
 
 Fed.R.Evid. 801.
 
 [21]
 
 Moreover, it was contradicted by the testimony of Nathan and Brown, the only witnesses present at the subsequently reported conversation.
 
 [22]
 
 We note that the hearsay rule is not merely a technicality, but rests on the sound principle that the reliability of out-of-court declarations not made under oath and not subject to cross-examination and other checks of the trial process is inherently suspect.
 
 McCormick’s Handbook of the Law of Evidence
 
 § 245, at 581-83 (2d ed. 1972). Therefore, the evidence establishes that the only threat made by Southmark or its agents was to aggressively enforce the personal guaranties on The Charles House and Pier Eight loans. Such a threat does not constitute duress. The general rule is that
 

 
 *876
 
 “... it is not duress to threaten to do what one has a legal right to do. Nor is it duress to threaten to take any measure authorized by law and the circumstances of the ease_ Thus, it is the established rule that it is not duress to institute or threaten to institute civil suits, or take proceedings in court, or for any person to declare that he intends to use the courts wherein to insist upon what he believes to be his legal rights, at least where the threatened action is made in good faith, that is, in the honest belief that a good cause of action exists, and does not involve some actual or threatened abuse of process.” 25 Am.Jur.2d,
 
 Duress and Undue Influence
 
 § 18 at 375-76 (1966) (footnotes omitted).
 

 As Professors Williston and Jaeger explain:
 

 “The law provides certain means for the enforcement of their claims by creditors. It is not duress to threaten to resort to these measures. Therefore, a threat to bring a civil action or to resort to remedies available under a contract is not such duress as will justify rescission of a transaction induced thereby. This is true even though it is subsequently determined that there is no legal right to enforce the claim, provided the threat is made in good faith ....
 

 “But where a threat of civil action or use of an available remedy is made
 
 only
 
 for the purposes of extortion, duress may be found.” S. Williston and W. Jaeger,
 
 A Treatise on the Law of Contracts
 
 §§ 1606-07 at 672-73, 681 (3rd ed. 1970) (footnotes omitted).
 

 These principles have been followed in the federal courts,
 
 see, e.g., Automatic Radio Mfg. Corp. v. Hazeltine Research, Inc.,
 
 176 F.2d 799, 804 (1st Cir.1949),
 
 aff'd on other grounds,
 
 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312,
 
 rehearing denied,
 
 340 U.S. 846, 71 S.Ct. 13, 95 L.Ed. 620 (1950);
 
 Jamestown Farmers Elevator, Inc. v. General Mills,
 
 552 F.2d 1285, 1290 (8th Cir.1977), and in Louisiana.
 
 See
 
 La.Civ. Code Ann. 1856 (West 1952);
 
 New Orleans & N.E.R. Co. v. Louisiana Const. & Imp. Co.,
 
 109 La. 13, 33 So. 51 (1902);
 
 Gallent v. Womack,
 
 415 So.2d 362, 363 (La.App.1982);
 
 State v. Sewerage & Water Board of New Orleans,
 
 138 So.2d 856, 861-62 (La.App.1962).
 
 [23]
 

 Appellants do not assert, and the record does not suggest, that Southmark lacked an “honest belief that a good cause of action” existed justifying suits against the guarantors. To the contrary, it is undisputed that the Pier Eight guarantors were liable on the Pier Eight loan which was in default at the time of Brown’s threat. Moreover, it cannot be seriously disputed that Southmark had at least a reasonable basis to believe that it had a valid cause of action against The Charles House guarantors. The Charles House Corporation had failed to pay local taxes when due, and liens had been filed against it, both on their face acts of default under the loan agreement. Moreover, although appellants now allege that it was intended under the loan agreement that upon depletion of the interest reserve, interest payments by the debtor would be waived until completion of the project, such a construction of the contract appears to contradict the plain language of the notes (executed by The Charles House Corporation, through Craig, with endorsements by Craig, Daniel, and Flotte) stipulating that interest shall be payable monthly. There is simply no evidence that Southmark lacked
 
 *877
 
 a good faith belief that it possessed good causes of action when it threatened to press its claims against the Pier Eight and The Charles House guarantors.
 
 [24]
 
 Indeed, Nathan testified, in effect, that Southmark had enforceable claims.
 

 Appellees made a
 
 prima facie
 
 showing of entitlement to summary judgment, and hence appellants, to prevent such a judgment against them, were “required to bring forward ‘significant probative evidence’ demonstrating the existence of a triable issue of fact.”
 
 In re Municipal Bond Reporting Antitrust Litigation,
 
 672 F.2d 436, 440 (5th Cir.1982).
 
 See also Ferguson v. National Broadcasting Co., Inc.,
 
 584 F.2d 111, 114 (5th Cir.1978);
 
 Wayne v. Tennessee Valley Authority,
 
 730 F.2d 392, 396 (5th Cir.1984). This appellants failed to do. The summary judgment for appellees was accordingly proper.
 

 V.
 

 CONCLUSION
 

 Because we hold that the district court had jurisdiction and that the trustee’s sale of appellants’ property to Southmark must be given
 
 res judicata
 
 effect, the judgment of the district court dismissing appellants’ counterclaim and granting appellees declaratory relief is affirmed.
 

 AFFIRMED.
 

 [1]
 

 . The original reorganization proceedings in this case arose under the Bankruptcy Act of July 1, 1898, ch. 541, 30 Stat. 544, as amended at 11 U.S.C. §§ 101,
 
 et seq.
 
 (1976). The Bankruptcy Act was replaced by the Bankruptcy Reform Act of November 6, 1978, ch. 1, 92 Stat. 2549. The 1978 Act provides that cases commenced under the former Bankruptcy Act are to be determined by the former Act. Pub.L. No. 95-598, Tit. IV, § 403(a), 93 Stat. 2549, 2683 (1978). The provisions discussed in this opinion refer to the former Act. All subsequent citations to the former Act will be made to the appropriate section of the 1976 version of the United States Code.
 

 [2]
 

 . The remaining stock is held by the following persons: Lionel E. Flotte, Jr., 35 percent; Hartman Daniel, 25 percent; and David F. Craig, Jr., 15 percent.
 

 [3]
 

 . Citizens & Southern Bank performed as investment advisor to Southmark until approximately 1976. The companies were separately owned.
 

 [4]
 

 . According to Craig, although the "Prime Lending Rate” historically had never risen over eight percent, it eventually rose to twelve percent during the construction period, driving up the interest rate on The Charles House loan to sixteen and one-half percent. Four and one-half points over the Citizens
 
 &
 
 Southern Bank prime on December 6, 1972 was twelve percent.
 

 [5]
 

 . Among the improper acts allegedly committed by Southmark in asserted breach of its contractual obligations were the following:
 

 Initiating foreclosure proceedings on the basis that The Charles House Corporation had defaulted in interest payments on its loan, following depletion of the interest reserve, "even though it was agreed and contemplated that the interest was to be taken only from the construction loan and that the depletion of the funds allocated for interest was not to be a ground or cause for foreclosure":
 

 Refusing "[bjefore, during, and after the foreclosure, ... all requests to increase the construction loan to cover the increased interest payments, to defer the interest until maturity, to extend the time for payment of interest to refinance or allow refinancing of the construction loan, or to otherwise resolve the condition of the rapidly rising interest rates and resulting increased interest deductions”;
 

 Initiating the foreclosure for the purpose of taking the equity and the profits of The Charles House property;
 

 Refusing to permit The Charles House Corporation to convert The Charles House to condominiums;
 

 Refusing all offers to resell The Charles House after the trustee’s sale;
 

 Converting The Charles House to condominiums several years after the trustee’s sale;
 

 Threatening to foreclose on an unrelated real estate project known as The Pier Eight Apartments unless The Charles House Corporation allowed Southmark to complete the foreclosure.
 

 [6]
 

 . The counterclaim also made several allegations additional to those contained in the complaint filed in state court:
 

 That Southmark misrepresented that the rate of interest to be charged on the construction loan would be twelve percent or lower;
 

 That Southmark initiated the lawsuit against Craig in state court wrongfully alleging that The Charles House Corporation was in default on the loan and that Craig was in violation of the contract of guarantee;
 

 That Southmark communicated an "extortionate threat” to "ruin financially and professionally" the stockholders in The Charles House Corporation and the Pier Eight project,
 
 see
 
 note 5,
 
 supra,
 
 to force The Charles House Corporation to acquiesce in the trustee's sale of its property.
 

 [7]
 

 . The district court did not specify whether the dismissal was with or without prejudice. Rule 41(b), Federal Rules of Civil Procedure, specifies, however, that:
 

 “Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.”
 

 Because none of the exceptions specified in the Rule apply in this case, and the district court made it clear during its hearing on appellees' second summary judgment motion that it intended the judgment to be on the merits, we deem the dismissal of appellants' counterclaim to be with prejudice.
 

 Consistent with the position taken by appel-lees at oral argument, we construe the portion of the district court’s judgment granting appel-lees judgment on their count for declaratory relief as in essence being no more than an affirmative declaration of the same rights that are implicit in and flow from that part of the judgment dismissing appellants’ counterclaim.
 

 [8]
 

 .Appellants state that their initial prayer in the state court suit for transfer of title to the property to The Charles House Corporation was dropped after the property was sold to third parties as condominiums.
 

 [9]
 

 . Section 516 provides in part:
 

 "Upon the approval of a petition, the judge may ...
 

 "(3) authorize a receiver or a trustee or a debtor in possession, upon such notice as the judge may prescribe and upon cause shown, to lease or sell any property of the debtor, whether real or personal, upon such terms and conditions as the judge may approve
 

 Appellants argue that the district court’s jurisdiction is now in question following the Supreme Court’s decision in
 
 Northern Pipeline Const. v. Marathon Pipeline Co.,
 
 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). That decision, however, dealt solely with the constitutionality of the powers exercised by bankruptcy courts established under the Bankruptcy Reform Act of 1978.
 
 See
 
 note 1,
 
 supra. Northern Pipeline
 
 in no way suggests that the district court exceeded its jurisdiction in the reorganization proceedings (or would not have had jurisdiction over a counterclaim by the trustee against Southmark arising out of the same transaction as that made the basis of South-mark’s claim in the reorganization proceedings).
 

 [10]
 

 . Appellants argue that because the legality of Southmark’s foreclosure on or acquisition of the property was not raised in the reorganization proceedings, there was no final judgment on the merits. Appellants misapprehend the “final judgment” requirement of the
 
 Kemp
 
 test. As Professor Moore explains:
 

 "A judgment may be final in the sense that it terminates the present action, though it does not bar the plaintiff’s claim .... All that can be said, then, is that a final judgment for purposes of res judicata must finally dispose of some matter which under the substantive law to be applied and the procedural law of the forum can be, and has been, finally disposed of.” IB
 
 Moore’s
 
 ¶ 0.409[1.-1] at 301.
 

 [11]
 

 . For purposes of this analysis, we do not distinguish between these terms.
 
 See Kaspar Wire Works, Inc. v. Leco Engineering & Machine, Inc.,
 
 575 F.2d 530, 535 (5th Cir.1978).
 

 [12]
 

 . Section 24 of the Restatement provides in part as follows:
 

 "(1) When a valid and final judgment rendered in an action extinguishes the plaintiff’s claim pursuant to the rules of merger or bar ..., the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose."
 

 
 *871
 
 Comment c to section 24 of the Restatement provides in part as follows:
 

 "Transaction may be single despite different harms, substantive theories, measures or kinds of relief
 
 ....
 

 "That a number of different legal theories casting liability on an actor may apply to a given espisode does not create multiple transactions and hence multiple claims. This remains true although the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief."
 

 Appellants note that in determining whether the same causes of action are asserted in subsequent suits, this Court has examined whether the primary right and duty or wrong are the same in each action.
 
 See Kemp v. Burmingham News Co.,
 
 608 F.2d 1049, 1052 (5th Cir.1979). However, this Court, sitting en banc in
 
 Nilsen v. City of Mass Point, Miss.,
 
 701 F.2d 556, 560 n. 4 (5th Cir.1983), stated that the Restatement’s transactional test "represents the modern view” and is preferable to the test enunciated in
 
 Kemp.
 

 [13]
 

 . As was stated in House Report No. 1409 on H.R. 8046, 75th Cong., 1st Sess. 47 (1937):
 

 "The debtor, the trustee under an indenture for any securities of the debtor, any stockholder or creditor, is given the right to be heard on all matters. They may appear before the trustee, or the court; they may give information; they may comment upon a reorganization plan. In short, they are given the right to appear either in defense, or in promotion of their own interests and to assist the trustee and the court.”
 

 [14]
 

 . The purpose of such an action is explained by Moore:
 

 "In reference to a valid judgment, the independent action recognizes the validity of the judgment as a judgment, but seeks to enjoin the holder, or otherwise grant appropriate relief from the operation
 
 of
 
 the judgment, upon established principles that make it against conscience for the holder of the judgment to retain its benefits." 7
 
 Moore's
 
 ¶ 60.-41[1] at n. 13.
 

 The essential elements of the independent action are:
 

 ‘“(1) a judgment which ought not, in equity and good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the' judgment is founded; (3) fraud, accident, or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense; (4) the absence of fault or negligence on the part of defendant; and (5) the absence of any adequate remedy at law.’ ’’
 
 Bankers Mortgage Company
 
 at 79 (citation omitted), quoting
 
 National Surety Co. v. State Bank,
 
 120 F. 593, 599 (8th Cir.1903).
 

 [15]
 

 . Appellants have also stated in the district court and on appeal that they are
 
 not
 
 attacking the district court’s reorganization orders. It is hence arguable that there is no basis for considering their alleged equitable grounds to avoid the
 
 res judicata
 
 effects of that judgment. However, as we in any event find appellants’ equitable claims to be insufficient on their merits, even if urged in a properly presented attack on the reorganization orders, it is unnecessary to consider the effect of appellants’ disclaimers of such an attack.
 

 Further, because we reject these claims of appellants on their merits, we likewise do not reach the distinctly arguable contentions of ap-pellees that appellants’ claims in this respect are barred by laches and by appellees’ having dismissed their previous state court suits with prejudice.
 
 See Miller v. Meinhard-Commercial Corporation,
 
 462 F.2d 358, 361 (5th Cir.1972).
 
 See abo
 
 Restatement (Second) Judgments §§ 70(2), 74.
 

 [16]
 

 . “Whether particular facts are sufficient to constitute a defense of ... duress ... is a matter of law for the court, while the question of whether the facts alleged actually exist is a matter for the jury.”
 
 Jamestown Farmers Elevator, Inc. v. General Mills,
 
 552 F.2d 1285, 1290 (8th Cir.1977).
 

 [17]
 

 . As noted,
 
 supra,
 
 Flotte and Daniel were stockholders of The Charles House Corporation and guarantors on the construction loan. Zis-sus, Elms, Elms’ sisters, and Craig were personal guarantors on a separate loan made by South-mark to construct another New Orleans real estate project, The Pier Eight Apartments. By the time reorganization proceedings had been
 
 *874
 
 initiated against The Charles House Corporation, the Pier Eight loan was in default.
 

 [18]
 

 . As noted
 
 supra,
 
 Southmark had filed suit against Craig, Flotte, and Daniel to enforce their guaranties on The Charles House loan. Although it is undisputed that the Pier Eight loan also was in default at the time of the alleged threat by attorney Brown, and that Craig, Zis-sus, Elms, and Elms’ sisters had guaranteed that loan, the record does not establish whether a foreclosure action, or suits to enforce the personal liability of the Pier Eight guarantors, had been filed at that time.
 

 Nathan’s relevant testimony was as follows: ”[0]ne of the threats that was made was that if this [the reorganization proceedings] was not concluded on these terms that the [state court] proceedings were going forward against the individuals and that all of them were going to be literally hounded for payment so that they would have to either come up with the funds, ... and that the only recourse would then be for them to file individual bankruptcies."
 

 “Among the so-called threats that were made had to do with pressing on Pier 8 and involving George Zissus and his family, who were also endorsers on the loan there, and so there was exposure not only to Hartman Daniel and to Lionel Flotte, who were personal friends and business associates of David Craig’s, but also of the Zissus family .... I interpreted the position of Jerry Brown ... and I communicated that to David Craig. I told him that as it was presented to me, if the individuals did not cooperate that the lawsuits against them would be pushed, that they would ultimately result in judgments against them if the plan for reorganization did not prove viable; that they would be able to force a sale of all of Hartman Daniel’s assets and Lionel Flotte’s assets and very likely be able to force all three of these individuals into bankruptcy .... I said, ‘You are dealing with a wounded bear and these people have the right, in my view, to proceed along those lines and will proceed along those lines,’ and I urged David Craig to accept the settlement in order to avoid that outcome, and I encouraged him to wipe the slate clean and start fresh.
 

 “Q There were no personal threats, I mean in the sense of harm, physical harm?
 

 “A Oh, no indeed, absolutely not.
 

 “Q It was a question of relying on the rights accorded to them in full?
 

 "A And asserting—
 

 "Q —and asserting them under those documents?
 

 “A And asserting them in full to the point of causing the loss of all of the personal assets of these individuals."
 

 [19]
 

 . Brown testified in pertinent part:
 

 "[W]e on behalf of [Southmark] had filed suits against three endorsers in State Court and we were pushing those suits, trying to push them. They were ordinary lawsuits, so basically after some negotiations, the attorney for the debtor agreed that he would, agreed that we would dismiss the appeal, permitting the property to be sold in the Chapter 10 proceedings by the trustee at a marshal’s sale and that in exchange for that we would forego any attempts to collect any deficiency that might result from the three endorsers.
 

 "Q Now, in connection with the settlement that was made with The Charles House Corporation and the individual guarantors, it has been alleged that you on behalf of Citizens and Southern Realty Investors related to Max Nathan as attorney for The Charles House Corporation and the guarantors that if they didn’t settle on this basis, and this is, I am paraphrasing this, that Citizens and Southern would bring their full weight to bear against the individual guarantors and pursue all rights that Citizens and Southern Realty Investors had under those guarantees] with respect to the individuals. Do you—
 

 "A Sure, we were already suing the endorsers already. We already had three lawsuits pending and we were going to continue with those lawsuits if we didn't get the property sold, get some satisfaction,”
 

 [20]
 

 .Daniel’s relevant testimony was as follows:
 

 "I got a telephone call from Mr. Craig to the effect that Mr. Nathan had called him and told him that he had had a meeting with the attorneys for C & S and that they were threatening to take personal action against the shareholders on their indemnifications and endorsements. And he also mentioned to me that they had threatened a similar action against the shareholders of the Pier 8 apartment building....
 

 "Q Was [permitting the reorganization sale] in consideration of an agreement by Citizens and Southern Realty Investors that they would not pursue you, Mr. Flotte and Mr. Craig individually?
 

 “A That was the agreement, correct.
 

 "Q Now, was the only threat that Mr. Craig conveyed to you that
 
 C & S
 
 Realty Investors was going to pursue you, Mr. Craig and Mr. Flotte individually?
 

 "A Yes.
 

 "Q That was the only threat that he conveyed to you?
 

 "A No, well, that was the only threat against me. I wasn’t involved in the other one, but he conveyed the entire story to me, yes.
 

 "Q No, but with respect to you individually?
 

 "A Yes, that was the only threat against me.
 

 "Q Was to pursue you individually on your guaranty?
 

 "A Yes.
 

 "Q So that it is correct that at all times you knew that you had the personal obligation if in fact The Charles House Corporation was unable to satisfy the indebtedness.
 

 "A No question about it.”
 

 Flotte’s relevant testimony was as follows:
 

 "Q Did Mr. Craig tell you that through Max Nathan he had received threats that the full weight of the C & S organization would be brought to bear against you as well as all of the others?
 

 "A Basically, yes, I guess. I am not sure what the full force means. I took it in the effect that C & S would enforce the letter of the law and attack, you know, Hartman Daniel and myself and Dave, of course, but attack all of us on a personal endorsement and to take whatever steps were necessary to extract all of the funds, you know, required to satisfy the thing, which in effect meant, you know, force us against the wall, not just try and make a settlement with us.
 

 "Q At any time did you perceive that to involve any physical threat?
 

 "A No, no way.
 

 “Q Did you at any time perceive that to involve anything beyond pursuing you with respect to your personal guaranty], and by that I would mean seeking full enforcement of the personal guaranty]?
 

 “A Not specifically, except that there was either a statement made or it was brought out to me flat out that this would also extend to the Pier 8. As I recall, it was basically stated that if C & S were not, if we continued to fight C & S and not to allow them to disband the bankruptcy and obtain possession of the property, that they would through their legal thing here of obtaining the additional funds from us as personal endorsers and also pursue it on the Pier 8. It was definitely tied into Pier 8 as far as I can recall."
 

 [21]
 

 . We know of no exception to the hearsay rule that would allow admission of Craig’s testimony to prove what Brown said.
 
 See
 
 Fed.R.Evid. 802-04.
 

 [22]
 

 . And, Daniel’s and Flotte’s testimony shows that they understood the threat in the same way that Nathan’s testimony described it, and that they received this understanding from Craig.
 

 [23]
 

 . It is to be noted that these authorities do
 
 not
 
 deal with the kind of duress necessary to set aside a judgment, where arguably there should be a stronger showing and a close, direct relation to the integrity of the prior proceedings.
 
 Cf. Ira S. Bushey & Sons,
 
 167 F.2d at 18-19;
 
 Miller v. Meinhard-Commercial Corporation,
 
 462 F.2d 358, 361 (5th Cir.1972) (fraud must be extrinsic). We do not reach that question, as we hold that in any event there was no showing of the kind of duress necessary to set aside a contract or deed or the like.
 

 It may be an unsettled question whether federal or state law determines the equitable grounds on which a federal judgment may be attacked. See 7
 
 Moore's
 
 ¶ 60.37[2], Because we find no presently material differences between the views of the Louisiana and federal courts on this issue, we need not determine which law governs.
 

 [24]
 

 . Appellants also argue that because the reorganization sale resulted from the various other acts of misconduct allegedly committed to by Southmark, the earlier judgment should not be given
 
 res judicata
 
 effect. Appellants do not allege, however, that they lacked knowledge of these actions at the time of the reorganization sale or that these other actions amounted to duress or extrinsic fraud "which might give rise to the reopening of a former judgment in an independent equitable proceeding."
 
 Miller v. Meinhard-Commercial Corporation,
 
 462 F.2d 358, 361 (5th Cir.1972). It is well settled that fraud must be pleaded with particularity. 7
 
 Moore’s
 
 ¶ 60.37[1] at 60-378.
 

 We have considered appellants’ remaining arguments and find they lack any substantial merit.