**HOTEL CORPORATION OF the SOUTH and Geoffrey J. Boulmay, Sr.**

v.

**RAMPART 920, INC., First Republic Corporation, North Rampart Corporation, Raymond Peacock, Alvin C. Copeland and Lawrence Catha.**

**Civ. A. No. 84–3346.**

United States District Court, E.D. Louisiana.

Feb. 21, 1985.

Robert Barkley, Jr., J. David Forsyth, Patricia Tunmer, of Sessions, Fishman, Rosenson, Boisfontaine & Nathan, New Orleans, La., for defendants.

## MEMORANDUM OPINION

FELDMAN, District Judge.

This eccentric saga is the result of a simple fight: who will control the destiny of the Landmark Motel Hotel in New Orleans? Before the Court is Defendants' motion to dismiss this suit, or in the alternative for summary judgment.

■ But before turning to the merits of the motion, it is necessary to discuss Plaintiff's motion to recuse, which was orally made during argument immediately following a disclosure for the record by the Court that my law clerk, Ms. Lisa Avery-Peck, was interviewed by the firm representing the Defendants before the pending motion was filed. She has not been offered employment, and I have instructed her and the firm to have no more conversations until this motion is resolved. In fact, both my law clerks have interviewed with the firm. Neither clerk has received any offer and, for that reason, I denied the motion to recuse myself after voluntarily making the disclosure for the record. The interviews have had no influence whatsoever on my decision, nor the work of my law clerks. The motion to recuse was, in the Court's opinion, made for the purpose of delay because the Court had earlier denied Plaintiff's motion to continue.

Considering the memoranda and supporting exhibits submitted by the parties, the supplemental memoranda requested by the Court and the oral argument of counsel, Defendants' motion is granted for the reasons that follow.

*This Suit*

This suit is one in a long and vexing series of lawsuits [1] involving these parties.

Louis R. Koerner, Jr., New Orleans, La., W. Kenneth Klein, Slidell, La., for plaintiffs.

1. In addition to several adversary proceedings in Bankruptcy, the parties have filed suits in Civil District Court for Orleans Parish and in the 22nd Judicial District Court for St. Tammany

In this suit, Plaintiffs sue Defendants to recover damages for injuries resulting from a host of alleged wrongs: 1) violations of Federal securities law; 2) fraud in a Chapter 11 Bankruptcy proceeding; 3) violations of the Racketeer Influenced and Corrupt Organizations Act (RICO); and 4) strict liability and negligence under state law. Plaintiffs seek a declaratory judgment declaring the Defendants to be in violation of various plans of reorganization in Bankruptcy, in violation of various agreements between these parties made in the context of the Bankruptcy proceedings, and declaring that Plaintiff, Geoffrey Boulmay, is entitled to retain certain stock as security for the performance of obligations allegedly owed to him by Defendants or in partial satisfaction of any judgment rendered in his favor in this suit.

### The Controversy and Its Procedural Thicket

Plaintiff, Geoffrey Boulmay, once owned all of the stock of Defendant, First Republic Corporation. First Republic in turn owned all of the stock of Rampart 920, Inc. and Rampart 920 owned the Landmark Motor Hotel. The Landmark Motor Hotel formerly was the Vieux Carre Motor Lodge (hereafter "Hotel").

Rampart 920 filed for reorganization under the Bankruptcy Code on February 24, 1981. Soon thereafter First Republic also filed for reorganization. The two proceedings were consolidated in *In the Matter of Rampart 920, Inc., First Republic Corporation, debtors,* Bankruptcy Nos. 81–315K, 81–475K.

Also, in 1981, Defendant, Raymond Peacock, purchased all of the stock of a company named North Rampart from Geoffrey Boulmay's brother, Gerald Boulmay. Peacock also began operating the Hotel under a lease from Rampart 920. Prior to the Bankruptcy reorganization proceedings, Plaintiff, Hotel Corporation of the South, a corporation wholly owned by Boulmay, apparently also operated the Hotel in some

unexplained capacity. The actions of both Messrs. Peacock and Boulmay have been clear inducements to this controversy centering on the Hotel.

### The Reorganization Proceedings

Rampart 920, First Republic, and North Rampart filed a Bankruptcy Plan of Reorganization on October 5, 1981. The Plan listed as claims against the debtors' estates, among others, a third mortgage on the property held by Geoffrey Boulmay to secure a debt owed to him by Rampart 920 and the unsecured debts of Hotel Corporation of the South,[2] to the extent that these were approved and allowed by the Bankruptcy Court. The Plan provided for the cancellation of Boulmay's third mortgage. It also provided that Rampart 920 would pay all court-allowed and approved debts of Hotel Corporation of the South. North Rampart was to lend Rampart 920 the money to satisfy its obligations under the Bankruptcy Plan.

The Plan also provided that ⅔ of the stock of First Republic would be transferred to North Rampart, and ⅓ of the stock of First Republic would be sold to North Rampart. The debt for the sale of the stock was evidenced by a promissory note in the principal amount of $1,450,000 payable in 240 monthly installments with interest at a rate of 11% per year. The note was secured by stock pledges guaranteed by Defendants Peacock, Copeland and Catha. It is the credit sale for ⅓ of First Republic's stock which is the centerpiece of the struggle for control of the Hotel.

The Plan of reorganization was later amended to provide that Boulmay would be paid $500.00 in connection with the cancellation of his third mortgage on the property.

Rampart 920, First Republic Corporation and North Rampart filed a Second Amended Plan of Reorganization on March 5, 1982. That Plan was confirmed by the

Parish. These suits ultimately were removed to Bankruptcy Court.

**2.** These debts were listed notwithstanding the fact that Hotel Corporation of the South was not a debtor in the Bankruptcy Proceedings.

Bankruptcy Court on April 12, 1982. The Plan changed the interest rate payable on the promissory note issued in connection with the stock sale from 11% to 8⅜%. Thereafter, Defendants executed an indemnity agreement on May 12, 1982, in which they agreed to indemnify Boulmay against liability arising out of his ownership and operation of the Hotel.

After confirmation of the Second Amended Plan, Defendants again sought to amend the reorganization Plan. They took the position that the debts of the Hotel and the expenses involved in taking it over from Boulmay had exceeded what they had anticipated. Defendants sought a reduction in the principal amount of the $1,450,-000 note. Boulmay took the position that Defendants had breached their obligations under the Second Amended Plan. The parties ultimately compromised their differences and executed an agreement on March 3, 1983 (the "Agreement"). They also confected a Third Amended Plan of Reorganization which incorporated by reference the Agreement. The Plan further provided that the Agreement would provide the means for execution of the Second Amended Plan to the extent that it modified the means for its execution.

The Bankruptcy Court approved the Agreement between the parties, authorized the Debtors to amend the Second Amended Plan in conformity with the Agreement and ordered that the Second Amended Plan be so modified. The Court also issued an Order granting Rampart 920 permission to obtain a $900,000 loan from Gulf Federal Savings and Loan.

The Agreement embodied the parties' compromise regarding the amount to be paid for ⅓ of the stock of First Republic which was sold to North Rampart under the Plan, as amended. To satisfy the $1,450,000 note, it was agreed that Defendants would make certain cash payments to Boulmay and execute in solido a certain promissory note (the "Note") payable to the order of Boulmay in the principal amount of $400,000. The principal was payable in one year. Interest was payable at a rate or 9% a year. The Note was secured by pledges of all the outstanding stock of Rampart 920, North Rampart and First Republic Corporation, and the pledge of a March 3, 1983, collateral mortgage note in the principal amount of $400,000 secured by a third mortgage on the Hotel. (The pledged stock and collateral mortgage note hereafter will be referred to as "the Collateral".) The Agreement also clarified which debts and obligations pertaining to the Hotel would be paid by Defendants.

*The Adversary Proceedings*

The Bankruptcy Proceeding spawned a paranoia which led to a host of angry adversary proceedings. The first of these was No. 83–272, and was brought in Bankruptcy Court. In that proceeding, suit was brought by the Defendants in the instant suit. Defendants apparently were told by counsel for Boulmay that they were in breach of the Agreement because they failed to pay certain debts of the Hotel. Boulmay, they were told, would therefore dispose of the Collateral (and try to take back the Hotel in the process).

In response, Defendants here initiated Adversary Proceeding No. 83–272 in Bankruptcy Court. In that suit they sought a preliminary and permanent injunction which would restrain Boulmay from selling and/or otherwise alienating the Collateral as he threatened to do. Boulmay responded by filing a Counterclaim in that proceeding. In it he alleged breach of the Agreement. He sought to declare Defendants in breach of the Agreement, to accelerate the Note, and to take other actions consistent with his view that Defendants had not fulfilled their contractual obligations. Boulmay also filed a Motion to Revoke Confirmation of the Third Amended Plan. As grounds for the Motion to Revoke, Boulmay claimed that Defendants had breached their obligations under the Reorganization plan. In his motion and memorandum Boulmay specifically alleged that Defendants had made misrepresentations in connection with the Third Amended Plan. Defendants filed a Motion to Dismiss the Counterclaim.

After conducting hearings on the Motions, the Bankruptcy Court issued findings of fact in open court on August 10, 1983. The Bankruptcy Court stated that it:

"is satisfied that the proponents of the Plan have carried it out in the intent and purposes that it was submitted and that there has been no cause to revoke the confirmation of that Plan... *There has been no proof of any fraud in connection with this matter.*" (emphasis added)

The Bankruptcy Court dismissed Boulmay's Counterclaim, denied his Motion to Revoke Confirmation of the Third Amended Plan and permanently enjoined Boulmay, his agents, servants, and the like from selling or alienating the Collateral. Boulmay did not file a timely notice of appeal from the Judgment. The Bankruptcy Court denied Boulmay's motion for an extension of time in which to file a notice of appeal. The Judgment in Adversary Proceeding 83–272 became final.

But the saga of the Hotel was destined to continue.

Defendants to the instant action filed a second Adversary Proceeding in Bankruptcy Court in the summer of 1983. The filing of that action was precipitated by the service on Defendant Catha of an Internal Revenue Memorandum and Notice of Levy directed to Defendants Catha, Peacock and Copeland. The Notice of Levy directed the seizure of all property, rights to property, money credits and bank accounts in the possession of Catha, Peacock or Copeland, belonging to Boulmay, up to $23,624.35. In response to the Notice, Defendants filed a Complaint for Interpleader in Bankruptcy Court, which became Adversary No. 83–389.

The Bankruptcy Court authorized deposit of all future payments due under the Note into the Registry of the Court. The IRS then filed a Motion to Dismiss the Interpleader on the ground that the law forbids interpleader against the IRS in such a situation. After hearing the motion, the Bankruptcy Court entered judgment dismissing the Interpleader and directing the Clerk of Court to pay the IRS all funds deposited. In accordance with the Judgment and the IRS levy, Defendants began making interest payments due on the Note to the IRS, instead of to Boulmay.

Plaintiffs, apparently of the belief that the conduct of Defendants pursuant to Bankruptcy Court orders has created more actionable wrongs centering around ownership and operation of the Hotel, bring this suit claiming RICO, Bankruptcy, securities laws and state law violations.

*The Motion*

Defendants base their Motion to Dismiss or for Summary Judgment on principles of res judicata, collateral estoppel and the running of the statute of limitations provided by the Bankruptcy Code. The Court finds that res judicata bars this suit in its entirety. Additionally, the Court finds that portions of Plaintiffs' suit are barred by provisions of the Bankruptcy Code itself, and provisions of the Bankruptcy Code in conjunction with collateral estoppel.

*Res Judicata*

■ It is well established that for a prior judgment to bar a later suit on grounds of res judicata, four prerequisites must be met. First, the parties to both suits must be identical. Second, the prior judgment must have been rendered by a court of competent jurisdiction. Third, there must have been a final judgment on the merits. Finally, the same "cause of action" must have been involved in both cases. *Southmark Properties v. The Charles House Corporation,* 742 F.2d 862 (5 Cir.1984).

■ In testing for identity of the parties, it is clear that courts have looked beyond the formal, or paper, parties. Courts examine the parties in interest: Persons whose interests properly are placed before a court by someone with standing to represent them will be bound by matters determined in a proceeding before that court. *Id.* In *Southmark,* for example, the Fifth Circuit found that a president and 25% stockholder of a debtor corporation was a "party in interest" in the Bankruptcy proceedings of the debtor corporation even

though the president had not been a formal party to the Bankruptcy proceeding. The Court in *Southmark* grounded its findings on two facts: First, the stockholder had a statutory right to be heard on all matters arising in the bankruptcy proceedings under 11 USC 606. Second, the stockholder had participated actively in the bankruptcy proceedings, even though he never formally had intervened in them as a party.

■ Another aspect of the flexible rather than formal and technical view of the "parties" requirement, is that a judgment entitled to res judicata effect bars relitigation not only by parties, but also their privies. *Southmark* at 870. In *Southmark,* the Court found that the 25% stockholder/president of a corporation who had guaranteed the construction loan at issue in that case, was a "privy" of the corporation. The Court reasoned that the stockholder had had a direct pecuniary interest in the outcome of the reorganization proceedings, and he had exercised substantial control over the litigation on behalf of the corporation in those proceedings.

In testing whether the same claim or cause of action is involved in the two suits, the Fifth Circuit adopts the transactional analysis of the Restatement (Second) of Judgments. *Southmark* at 870.

The Restatement (Second) provides in part that:

(1) When a valid and final judgment rendered in an action extinguishes the Plaintiff's claim pursuant to the rules of merger or bar..., the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. (Section 24)

Comment c to Section 24 clarifies that:

Transaction may be single despite different harms, substantive theories, measures or kinds of relief...

That a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple transactions and hence multiple claims. This remains true although the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief.

Applying the Restatement test in *Southmark,* the Fifth Circuit found that the suit before it and the previous proceedings involved the same claim or action. *Southmark*'s rationale finds its mark here as well. The Court reasoned that "the central transaction involved in both the reorganization sale and appellant's present claim was the passing of title to and ownership of the Charles House property from the Charles House Corporation to Southmark in exchange for cancellation of the mortgage debt." In language strikingly applicable to this case, the Court noted that "although appellant's claim alleges various other acts of wrongdoing by Southmark, all of those acts are alleged to have produced or resulted from and were integrally related to the sale of property to Southmark. They all involved 'a common nucleus of operative facts'." The Court concluded that since appellants' challenge to Southmark's right to take ownership of the property was extinguished by the prior reorganization proceedings, appellants' remedies against Southmark "with respect to all or any part of the transaction or series of connected transactions out of which the action arose" also were extinguished.

The "common nucleus of operative facts" test is the critical guide for the issues this Motion raises.

The Court is convinced that the judgments of the Bankruptcy Court in Adversary Proceedings 83–272 and 83–389 are res judicata as to all the claims asserted by the Plaintiffs in the instant suit. All of the res judicata prerequisites are present. Plaintiffs' claims in the instant suit therefore are barred.

■ We begin our analysis by considering whether the parties in the instant suit are identical to the parties in the adversary proceedings in the Bankruptcy Court. Plaintiffs strenuously argue that the requi-

site "identity of the parties" is lacking in this case because Hotel Corporation of the South was not a party to the adversary proceedings in the Bankruptcy Court. While the Court recognizes that Hotel Corporation was not formally made a party to the adversary proceedings in bankruptcy, it finds that its interests were properly placed before the Court by Geoffrey Boulmay, who, by virtue of his sole ownership of the corporation and his status as president, was someone who had standing to represent Hotel Corporation. See *Southmark* at 859. Mr. Boulmay repeatedly asserted the interests of Hotel Corporation throughout the Adversary and other bankruptcy proceedings.

■ Moreover, even if Hotel Corporation of the South is not deemed a party to the adversary proceedings in Bankruptcy, it is bound by the res judicata effect of those earlier proceedings because it is a privy of Geoffrey Boulmay as *Southmark* so clearly teaches. Hotel Corporation was solely owned and controlled by Boulmay, its president. Hotel Corporation had a strong and direct pecuniary interest in the Adversary Proceedings in Bankruptcy. It was the third party beneficiary of the plans and agreements formulated and litigated in the Bankruptcy Proceeding. The debts of Hotel Corporation were listed as debts to be paid by the debtors. Finally, Boulmay exercised substantial control over the litigation on behalf of Hotel Corporation. *Southmark, supra; Drier v. Tarpon Oil Co.*, 522 [3] F.2d 199 (5th Cir.1975).

■ It is next necessary to consider whether the instant suit involves the "same cause of action or claim" that was involved in the Adversary Proceedings in Bankruptcy Court. Under the transactional test adopted by the Fifth Circuit in *Southmark*, the Adversary Proceedings in Bankruptcy Court did involve the same cause of action being asserted here by Plaintiffs. Whether labeled fraud, securities violations, RICO claims or negligence claims, the common nucleus of operative facts is the same. The central transaction which precipitated the Adversary Proceedings in Bankruptcy Court and the Plaintiffs' present lawsuit was the transfer of the Rampart 920 and First Republic stock, the ownership of the Hotel, and the Defendants' compliance with the Plan of Reorganization. The suits unqualifiedly involve a "common nucleus of operative facts". Although Plaintiffs now characterize the acts of wrongdoing by Defendants as RICO violations, securities fraud, bankruptcy fraud and negligence under state law, all of these acts are alleged to have been produced by or to have resulted from and were integrally related to, the transfer of the Rampart 920 and First Republic stock, the ownership of the Hotel, and the alleged noncompliance by Defendants with the Plan of Reorganization. Plaintiffs' right to challenge Defendants' right to the stock and Defendants' conduct in Bankruptcy Court was extinguished by the Adversary Proceedings in Bankruptcy. Their right to pursue any additional remedies against Defendants with respect to all or part of the transaction or series of connected transactions out of which the action arose, is also extinguished no matter how different the current label. Plaintiffs cannot resurrect these claims by resorting to different legal theories or by demanding new and different forms of relief on the same common nucleus of operative facts.

■ Turning now to the third prerequisite to the application of res judicata, the Court finds that the orders of the Bank-

---

**3.** The Court recognizes that certain factual distinctions between this case and the *Southmark* and *Drier* cases may be made. In *Southmark* and *Drier,* the corporation had been a formal party to the first suit. The majority shareholder/officer was attempting to relitigate issues in the second suit. In the instant case, by contrast, it was the sole shareholder and president who had been a formal party to the earlier proceedings and it is the corporation that is attempting to relitigate issues in this, the second suit. The Court finds that this distinction is without significance. Indeed, in at least one respect, the facts of this case present an even stronger factual basis for a finding of privity than do the facts of *Southmark.* In the case before us, Hotel Corporation is 100% owned and controlled by Boulmay. The shareholder/officer in *Southmark* owned a mere 25% interest in the corporation involved in that case.

ruptcy Court in Adversary Proceedings 83–272 and 83–389 were "final judgments on the merits." Those orders completely disposed of Defendants' adversary complaints and Plaintiffs' counterclaims in those proceedings. They therefore were "final".[4] *In Re: Bestmann,* 720 F.2d 484 (8th Cir. 1983). It is undisputed that the judgments of the Bankruptcy Courts in the Adversary Proceedings were "on the merits" for purposes of res judicata.

Finally, it is clear that the judgments or orders issued by the Bankruptcy Court in the Adversary Proceedings were judgments rendered by a court of competent jurisdiction. Nothing in *Northern Pipeline Construction Co. v. Marathon Pipe Line Company,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) compels a different conclusion.[5]

In sum, the Court finds that the four requisites to application of res judicata are present in this case.

*Scope of the Doctrine of Res Judicata*

■ Res Judicata not only bars claims that actually were litigated in a previous proceeding. Its reach is broader than collateral estoppel. It bars litigation of claims which could have been litigated in a previous proceeding as well. *Southmark* at 872. That is so as long as the procedural system available in the previous proceedings allowed the affected party to raise the claim in the earlier proceedings. *Southmark* at 871.

In this case, Plaintiffs do not assert that they lacked the opportunity to raise the claims which they assert here in the previous Adversary Proceedings. They clearly

did not lack such an opportunity. Plaintiffs could have brought all the claims asserted here in the previous Adversary Proceedings by way of counterclaim.

■ It is clear, for example, that Plaintiffs' claim of bankruptcy fraud was or could have been raised in Adversary Proceeding 83–272. In 83–272, they sought revocation of the Bankruptcy Court's confirmation of the Third Amended Plan. They based their motion to revoke on the allegation that Defendants had defaulted on their obligations under the Plan. They complained that the Defendants.

> "never intended to pay certain unsecured creditors of Hotel Corporation of the South, but rather, attempted to 'finance out' through a payment of all points, fees and for the ownership interest of Geoffrey Boulmay from a loan on the estate of debtors..." Defendants ... "have attempted to use the solicitude of this court for the debtors to permit them to successfully carry out their plan, however unlawful and however contrary to the spirit and intent of the Bankruptcy laws it might be ..."

Further, they complained that Defendants' representations on a schedule listing the debts that would be paid by Rampart 920 out of funds received from Gulf Federal Savings

> "were false at the time that they were made because (Defendants) did not have the means or intent to satisfy all such obligations out of the funds provided by Gulf Federal ..."

Plaintiffs concluded that

> "The defaults herein are real, substantial and deliberate. Money which plaintiffs

**4.** During oral argument, Plaintiffs vehemently argued that the judgment in the Adversary proceeding 83–272 was not final. They reasoned that they could not immediately have appealed that judgment because the Bankruptcy Court refused their requests for Rule 54(b) certification. Plaintiffs' argument is without merit for two reasons. First, 54(b) certification was unnecessary under the circumstances. The adversary proceeding disposed of all of the claims against all of the parties to that proceeding. Second, it is clear that a judgment's res judicata effect is not contingent on the running of all the appeals from that judgment. Indeed, even the

pendency of an appeal does not affect the res judicata effect of a judgment. A case pending appeal is res judicata unless and until that judgment is reversed on appeal. *Fidelity Standard Life Ins. Co. v. First National Bank & Trust Co. of Vidalia, Georgia,* 510 F.2d 272 (5th Cir.1975) cert. den. 423 U.S. 864, 96 S.Ct. 125, 46 L.Ed.2d 94 (1975).

**5.** This will be discussed in more detail as the Court examines each of the claims that was or could have been litigated in the prior proceedings.

told this Court that they were going to use to pay debts has been used instead to buy the equity of a previous owner, thus exposing (Plaintiff) to personal claims and to a deteriorization (sic) of the security for the deferred portion of the agreed payment ..."

The Bankruptcy Court denied Plaintiffs' motion to revoke the Third Amended Plan. The minutes of the hearing in which it did so reflect that the motion to revoke was denied because "there has been no proof of fraud in connection with this matter."

Plaintiffs argue that the claim of fraud in the Bankruptcy Court was not litigated or decided in Adversary Proceeding 83–272. They reason that their Motion to Revoke was based only on the alleged *default* of the Defendants in failing to perform their obligations under the plan. That argument is fanciful, at best. It is clear that Plaintiffs were arguing in their motion to revoke that the Defendants were in default, at least in part, because of their alleged acts of misrepresentation, that is, because of their alleged acts of fraud. It thus is clear that the issue of damage from fraud in the bankruptcy actually was raised and litigated in Adversary Proceeding 83–272. Furthermore, even if the Court were to accept Plaintiffs' suggestion that they based their motion to revoke only on the alleged default of the Defendants, and that that claim is different from a claim of fraud, it is even more clear that Plaintiffs could and should have raised their claims of fraud in that proceeding.

 Plaintiffs do not claim that the acts of fraud complained of in the instant suit occurred after Adversary Proceeding 83–272, or that the acts were discoverable only after Adversary Proceeding 83–272 was over. Nor do they assert that the procedural system available in the earlier proceeding prevented them from raising their claims of Bankruptcy fraud in that proceeding. Finally, there is no doubt that the Bankruptcy Court could have constitutionally entertained and adjudicated these claims. The issue of fraud in the Bankruptcy proceeding is an issue "arising un-

der" Title 11. It is not a "related matter". Even under *Northern Pipeline, supra,* the Bankruptcy Court could adjudicate and render a judgment on this issue.

Similarly, Plaintiffs' RICO claims could have been litigated in Adversary Proceeding 83–272. The gravamen of Plaintiffs' RICO claims is that Defendants engaged in a conspiracy to acquire the Hotel, and, at the same time, reduced Boulmay's financial ability to resist the acquisition. Plaintiffs complain of the loss of enterprise, the reduction of their equity in the enterprise, and the failure of the Defendants to pay certain obligations as required under the Bankruptcy Plan.

It is clear that the allegation of non-payment of certain debts by Defendants was actually raised by Plaintiffs in Adversary Proceeding 83–272. They raised it in their counterclaim in that proceeding. The counterclaim prayed for a declaration that the Defendants were in default partly because of their alleged failure to pay certain debts.

That issue was also discussed by Plaintiffs in their Memorandum in support of Motion To Revoke the Third Amended Plan. In that Memorandum Plaintiffs asserted that the Defendants:

"have simply not paid or otherwise satisfied the specific obligations which they undertook under the various plans of reorganization to pay all taxes and all unsecured creditors of Hotel Corporation of the South and the Debtors, and certain specific obligations of Geoffrey Boulmay."

The Bankruptcy Court was unpersuaded by Plaintiffs' allegations. As has already been mentioned, it denied Plaintiffs' Motion to Revoke the Third Amended Plan. It also dismissed with prejudice Plaintiffs' counterclaim. The Court explained its reasons in open Court on August 10, 1983:

"The Court is satisfied that the proponents of the plan have carried it out in the intent and purposes that (sic) it was submitted and that there has been no cause to revoke the confirmation of that plan."

Plaintiffs' RICO claims are sufficiently similar and integral to the claims that Plaintiffs raised in Adversary Proceeding 83–272; Plaintiff could have brought the RICO claims in that proceeding by way of their counterclaim. Although RICO is a new label, the common nucleus of operative facts is unchanged and pervades this whole dispute. The predicate acts to which Plaintiffs point are mail fraud, securities fraud, Bankruptcy fraud, Defendant Peacock's guilty plea and Defendant Catha's indictment (although he was acquitted by the jury). Once again, Plaintiffs have offered no legitimate excuse for their failure to press their RICO claims in that proceeding. Rather, this separate suit appears to be part of a consciously chosen tactic. There is no suggestion that the acts which form the basis of Plaintiffs' RICO claims were undiscoverable at the time of the Adversary Proceeding. Nor is there any suggestion that the previous proceeding lacked the procedural mechanisms which would have enabled Plaintiffs to raise their claims in that proceeding. Finally, Plaintiffs' contention that it would have been unconstitutional for the Bankruptcy Court to adjudicate those claims is without merit. Even if the contention is correct, it is of no help because the emergency local rules promulgated by this Court solve the problem created by the jurisdictional grant of the Bankruptcy Reform Act of 1978. The local rules provide for the reference of "related proceedings" [6] to the Bankruptcy Court for Findings and Conclusions and a Proposed Judgment. They are reviewed by the District Court and either adopted or rejected. Plaintiffs could have brought their RICO claims at the time that Adversary Proceeding 83–272 was pending. The RICO claims could have been referred to the Bankruptcy Court and consolidated with the Adversary Proceeding. This would have converted 83–272 from a proceeding dealing exclusively with claims "arising under Chapter 11" to one dealing with some "related proceedings". This Court would then have had to review the Findings and Conclusions and Proposed Judgment of the Bankruptcy Court. In light of the existence of that procedural mechanism, Plaintiffs' claim of unconstitutionality is untenable.

Plaintiffs' state law claims also could have been litigated in Adversary Proceeding 83–272. In these claims Plaintiffs assert that the actions of the Defendants in the conduct of the Reorganization proceedings constitute violations of Louisiana Civil Code Articles 2315 and 2316. The crux of their claim is that they

> "seek enforcement of their respective rights pursuant to various agreements entered into by and between Boulmay and various defendants ... including the various disclosure statements and plans of reorganization confirmed by this (the Bankruptcy) Court ..."

The issue of Plaintiffs' rights and Defendants' corresponding obligations pursuant to the various agreements entered into between Plaintiffs and the Defendants in the context of the Bankruptcy Reorganization was raised by Plaintiffs in 83–272. Plaintiffs raised the issue in their Counterclaim and Motion to Revoke Confirmation of the Third Amended Plan. In the Counterclaim, Plaintiffs noted that

> "the said agreements and pledges provided for the performance of certain obligations and payments of certain debts by the ... (Defendants) ... including those set forth in Schedule A to the said agreement ..."

Plaintiffs proceeded to argue that Defendants had defaulted on the agreements. They sought a declaratory judgment that Defendants had defaulted on the agreements and other damages. In their Memorandum in support of Motion to Revoke Confirmation of the Third Amended Plan, Plaintiffs argued that "the obligations undertaken by the ... (Defendants) pursuant to the third Amended Plan and the ancillary documentation have not been performed in accordance with the letter or spirit of the Plan or of the Bankruptcy

---

**6.** Related proceedings are those civil proceedings, that, in the absence of a petition in bankruptcy, could have been brought in a federal district court or state court.

laws." Plaintiffs urged that the Defendants had failed to satisfy the obligations they had undertaken under the various plans. These alleged failures formed the basis of Plaintiffs' motion to revoke confirmation.

■ The state law claims asserted in the instant case center on the same facts as those urged by the Plaintiffs in 83–272. It is clear that these state law claims were or could have been raised and adjudicated in the Adversary Proceeding. Again, Plaintiffs have offered no legitimate excuse for their failure to raise these claims in the Bankruptcy Proceeding. They do not suggest that the facts forming the basis of those claims were undiscoverable until after that proceeding. Nor do they suggest that the Adversary Proceeding lacked the procedural mechanisms which would have allowed them to bring their state law claims as counterclaims in that proceeding. Rather, they assert only that it would have been unconstitutional for the Bankruptcy Court to adjudicate these claims. Once again, this Court is compelled to reject that claim; it is completely without merit. As previously noted our Local Rules of Court provided the mechanism by which "related claims" such as these, constitutionally could have been referred to the Bankruptcy Court during the interim period. They cure the constitutional problems which were raised in *Northern Pipeline, supra* and which were created by the Bankruptcy Reform Act of 1978.

Plaintiffs' securities fraud claims against Defendants also were or could have been litigated in Adversary 83–272. These claims, set out in paragraphs 51–60 of Plaintiffs' complaint, are rather rambling, at best. Paragraph 60, however, is illuminating. It clarifies that Boulmay seeks "retention and return of ownership of the stock plus damages and attorneys fees on account of the ... misrepresentations and other acts of manipulation, which caused him to agree to sign over the said stock, which resulted in continuing diminution of the amounts he was to receive therefor, and which constituted breaches of the

agreements entered into pursuant to the ... various plans of reorganization."

■ The claim that Defendants were in breach of agreements entered into pursuant to the reorganization plans actually was raised and litigated in 83–272. It was raised by Plaintiffs' counterclaim. That counterclaim alleged that

"4. The said agreements and pledges provided for the performance of certain obligations and payment of certain debts by the .... (Defendants)".

Plaintiffs asserted that Defendants had breached those agreements. The Bankruptcy Court rejected this claim and dismissed with prejudice Plaintiffs' counterclaim. Since this claim was one "arising under" Title 11, the Bankruptcy Court constitutionally could adjudicate it to judgment, and did do so.

Furthermore, all of Plaintiffs' securities fraud claims easily could have been litigated in 83–272. These claims could have been raised as a counterclaim to Defendants' main demand for an injunction preventing Plaintiffs from alienating the stock. The issues raised by these claims are intimately related to the issues raised by the claims which plaintiffs actually raised in Adversary Proceeding 83–272.

*The 180 Day Limitation Period*

■ Plaintiffs' claim of Bankruptcy fraud in Count II of their complaint is also barred by provisions of the Bankruptcy Code itself. 11 U.S.C. § 1144 provides that:

On request of a party in interest at any time before 180 days after the date of entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if such order was procured by fraud ...

This provision places a limit on the period of time within which a party may attack a bankruptcy plan on the ground that it was procured by fraud. To allow Plaintiffs to collaterally attack the Bankruptcy reorganization on grounds of fraud is to allow them to do indirectly what they no longer may do directly because of 11 U.S.C.

§ 1144. The Court therefore finds that Plaintiffs' claims of fraud in the Bankruptcy Proceedings also are precluded by 11 U.S.C. § 1144.

*Collateral Estoppel*

Plaintiffs' securities fraud claims also are barred by the operation of the doctrine of collateral estoppel in conjunction with 11 U.S.C. §§ 1125 and 1145. 11 U.S.C. § 1145 exempts offers or sales of securities in the context of a bankruptcy from Section 5 of the Securities Act of 1933 and from any state or local law requiring registration for offer or sale of a security. Section 1125 provides that anyone who solicits in good faith and in compliance with the applicable provisions of Title 11 or who participates in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale or purchase of a security, offered or sold under the Bankruptcy plan of debtor, will not be liable on account of such participation or solicitation, for violation of any applicable law, rule or regulation governing the offer, issuance, sale or purchase of securities.

 The doctrine of collateral estoppel bars relitigation of issues actually adjudicated and essential to the judgment in prior litigation between the same parties. *Johnson v. United States,* 576 F.2d 606, 611 (5th Cir.1978) cert. den. 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981). The prerequisites to application of the doctrine of collateral estoppel are: 1) That the issue at stake be identical to the one involved in the prior litigation; 2) that the issue is one which actually was litigated in the prior litigation; and 3) that the determination of the issue in the prior action was one critical and necessary to the judgment in the prior action. *Wehling v. Columbia Broadcasting System,* 721 F.2d 506, 508 (5th Cir. 1984). Like the related doctrine of res judicata, collateral estoppel bars parties and their privies.

 The issue of whether Defendants in good faith were participating in the plan of reorganization of Rampart 920 and First Republic actually was litigated in Adversary Proceeding No. 83–272. The issue was raised by Plaintiffs in their Motion to Revoke Confirmation of the Third Amended Plan. Plaintiffs based their charge of default on the allegation that defendants had made "misrepresentations" and had committed "conversion" of the assets of debtors' estates. In denying the Motion to Revoke, the Bankruptcy Court stated that it was "satisfied that the proponents of the plan have carried it out in the intent and purposes that (sic) it was submitted ..." Implicit in that finding is a finding that Defendants acted in good faith. Since the issue of Defendants' good faith actually was litigated and determined in Adversary Proceeding No. 83–272 in Bankruptcy, collateral estoppel bars Plaintiffs from relitigating the issue of Defendants' good faith. And since it conclusively has been established that the Defendants participated in good faith in the Bankruptcy Reorganization, the safe harbor of 11 U.S.C. § 1125 applies. Plaintiffs are precluded from asserting their securities fraud claims in the instant suit.

 At the outset, I characterized this case as an eccentric saga. It has become one because of the rash of repetitive and successive claims Plaintiffs have asserted here and in Bankruptcy. Courts should be loathe to encourage the kind of delaying tactics which have been encountered here. For example, courts will not countenance successive habeas corpus petitions for just that public policy reason. This case and the tactics Plaintiffs have pursued by bringing a host of claims integrally related to other claims, urged in other proceedings, but under different labels, bears a strong resemblance to the habeas petitioner who plays only one card at a time. Such tactics ought not be condoned.[7]

---

**7.** Another vivid example of Plaintiffs' cavalier tactics deals with the IRS levy. Plaintiffs claim that the IRS levy and seizure of monies owing Boulmay in the hands of the Defendants, and

the subsequent payment by Defendants (as ordered) of the interest due Boulmay under the March 3, 1983, promissory note to the IRS, rather than to Boulmay, somehow constituted a

For the foregoing reasons, Defendants Motion for Summary Judgment or in the alternative to dismiss, is GRANTED.

breach by Defendants of their obligations under the Third Amended Plan. This claim was or could have been litigated in Adversary Proceeding 83–389, the IRS interpleader. The Bankruptcy Court dismissed the Defendants' Complaint for Interpleader and ordered that all funds which the Defendants deposited into the Court's registry be turned over to the IRS. In so ordering, the Bankruptcy Court conclusively determined that the IRS had an absolute priority to those payments over Boulmay. Since all such claims were or could have been litigated in 83–389, Plaintiffs are barred by res judicata from relitigating them here as well.