**In re Waynette ALSTON, Debtor.**

**Waynette Alston, Plaintiff,**

**v.**

**U.S. Department of Education, Roderick Paige, Secretary of the Department of Education, Defendants.**

**Bankruptcy No. 02–14623DWS.**
**Adversary No. 02–0761.**

United States Bankruptcy Court,
E.D. Pennsylvania.

July 3, 2003.

Henry J. Sommer, CBAP, Philadelphia, PA, for Plaintiff.

Virginia R. Powel, Philadelphia, PA, for Defendants.

### MEMORANDUM OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the Complaint of the debtor Waynette Alston ("Debtor") to determine the dischargeability of a student loan pursuant to 11 U.S.C. § 523(a)(8). The Defendant Department of Education ("DOEd") contests the discharge, contending that Debtor has not met her burden to establish that repayment of the loan would be an undue hardship. For the reasons that follow, I respectfully disagree.

### BACKGROUND

Debtor is a healthy thirty-five year old high school graduate who borrowed money in 1985 to attend McCarries Nursing School. Because the school closed in 1986, she was unable to complete the program. While she applied for a refund of the monies paid, her application is still pending.[1]

---

1. She also was refused a closed school discharge.

For the five to seven years thereafter, she worked intermittently at low paying jobs, such as at a gas station. Her two children were born in 1983 and 1988. In 1992, as a welfare recipient, she was sent for training as a nursing assistant and received her certification after graduating in 1993.

Since 1993 Debtor has been continuously employed as a nursing assistant, housekeeper or clerk receiving approximately $8.50 per hour. Joint Pretrial Statement, Uncontested Facts ¶ 4. Her highest earnings occurred when she was employed as a housekeeper, then office administrator and supervisor for ten months at the Doubletree Hotel for $335 per week.[2] She was laid off after September 11, 2001 and has been unable to secure another hotel job. She remained unemployed until December 2002 when she secured her present job as a receptionist at Atria, an assisted living facility where her gross monthly income is $953 per month. *Id.* ¶ 5.[3] There are no open positions for a nursing assistant at Atria but even so, the pay scale for that job does not pay much more than her current position. Her income is supplemented by food stamps, the amount of which varies each month.

On February 27, 1999, Debtor signed a promissory note for a federal direct consolidation loan of her existing student loan, Exhibits US–1 and 2, which required her to make payments of $20.00 for six or seven months followed by no payments for the next six or seven months. This pattern of alternating payment and moratorium continued for three or four years with the payments presumably being applied to interest only as Debtor testified that the

loan balance was not reduced. She still owes approximately $3,000 on the loan.

During the period she made payment on the loan, Debtor had difficulty meeting her other expenses and her debts increased. Until 1–1/2 years ago, her children lived with her mother most of the time since she could not afford more than a one bedroom apartment which did not accommodate her family. In January 2000, she bought a 3–1/2 bedroom house "as is" valued at $15,000. She had to make repairs to its non-functioning bathroom and purchase furniture before her children could move in with her there. She also had to pay back real estate taxes; her monthly budget allocates $51 until 2005 for this expenditure. Debtor receives no child support from the children's father who is incarcerated. While her 19 year old daughter contributes $100–$150 from time to time, she presently has no job and the Debtor is uncertain whether she will continue residing with her in the home. Her fifteen year old daughter has two more years of high school.

Debtor's current expenses are for life's basic needs: housing, utilities, food, clothing (uniforms for her job), transportation for her (transpass) and her school age daughter (tokens), and the laundromat.[4] All of Debtor's current income is devoted to these expenses. She has no automobile,[5] cable television, or internet service. Her health insurance provided under welfare ends in December 2003. At the time of the hearing, her sole savings were $219, the amount of her next mortgage payment. Her house still needs substantial repairs. The skylight is leaking, the bathroom toilet does not work, the entire back of the house

---

**2.** She earned $12.10 per hour on weekends and $9.81 during the week.

**3.** *See* note 7 *infra.*

**4.** She has not been able to hook up her electric dryer.

**5.** Her car was repossessed when she could not keep up with payments.

needs to be pointed and the dryer connection rewired. In June or July 2003, her food stamps will be discontinued, decreasing her income by approximately $250 per month.

In 1999, 2000 and 2001, Debtor received a federal tax refund arising from the application of the earned income tax credit which is available to low income taxpayers. In 2001, she used the approximately $5,000 refund to do repairs to her house and buy furniture. In 2000 and 1999, she used refunds of $4,600 and $3,000, respectively, to reimburse her mother for the support of her daughters,[6] to buy furniture and pay bills.

Based on this record, Debtor contends that she has satisfied the criteria for a hardship discharge under *Pennsylvania Higher Education Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298 (3d Cir. 1995), *i.e.*, she cannot maintain a minimum standard of living and repay the loan, her circumstances are not likely to improve and her prior payments evidence her good faith, albeit futile attempts, to satisfy this obligation. The DOEd disagrees, arguing that the small loan of approximately $4,000 could be repaid under one its repayment plans with minimal effort.

## DISCUSSION

■ Debtor relies on § 523(a)(8) of the Bankruptcy Code to support her request for a discharge of her otherwise nondischargeable student loan, claiming that the failure to do so will impose an undue hardship on her and her dependent daughter. To establish her right to a hardship discharge, the Debtor must prove by a preponderance of the evidence that: (1) that she cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependent if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for student loans; and (3) she has made good faith efforts to repay the loans. *Id.* at 304–05; *Brightful v. Pennsylvania Higher Education Assistance Agency*, 267 F.3d 324, 328–29 (3d Cir.2001). All three elements of the test must be established to prevail. *Id.*

(1) Minimum Standard of Living. The Debtor earns approximately $14,000 annually,[7] and uses her full income to meet her most basic needs—food, clothing and shelter. She does not enjoy what is a basic resource to most other Americans, ownership of an automobile. Moreover, her resources will diminish significantly when her health insurance and food stamps later cease this year.

■ DOEd points to Debtor's expense for a cell phone and the second phone line in her house which her daughter uses and pays for as evidence that there is some leeway in her budget. It also contends that the daughter, who is currently unemployed, could contribute to the home where she lives with Debtor. Finally DOEd notes that Debtor could have paid off the loan with the income tax refunds she received.

I am not persuaded that the foregoing evidence does more than underscore the

---

**6.** Her mother has asthma and had a triple bypass so she cannot work.

**7.** At the stipulated current monthly gross income of $953, her annual income is $11,436, well below the poverty guideline of $12,120 for a person with one dependent child. 68 Fed.Reg. 6456–58, 2003 WL 255120 (F.R. Feb. 7, 2003). However, her pay statement, Exhibit P–1, shows net pay of $431 and gross pay of $514 for a two week period. Annualizing these numbers yields a higher income which I have used for the purpose of my findings.

reasonable choices Debtor has made with her limited income. She uses a cell phone to keep in touch with her ailing mother but goes without other things such as cable television to afford it. As a low income taxpayer, she was eligible for an earned income tax credit which resulted in refunds [8] which have been used, *inter alia,* to make the necessary repairs to her home which was inhabitable when purchased, to purchase other necessities such as furniture and to repay her mother who was providing food and shelter to her children. These expenses are normally part of a monthly budget but as Debtor did not have excess income to fund these needs, they were deferred and addressed only when the refunds were received. I reject DOEd's suggestion that Debtor should have not repaired her home, bought furniture or honored her obligation to support her children in order to repay the student loan.

■ It is well established that maintaining a minimal standard of living does not mean that Debtor has to live at a poverty level to repay her student loan. *See e.g., Nary v. The Complete Source (In re Nary),* 253 B.R. 752, 763 (Bankr.N.D.Tex. 2000); *Ammirati v. Nellie Mae, Inc. (In re Ammirati),* 187 B.R. 902, 906 (D.S.C. 1995), *aff'd,* 85 F.3d 615 (4th Cir.1996); *Hoyle v. PHEAA (In re Hoyle),* 199 B.R. 518, 523 (Bankr.E.D.Pa.1996). Comparing Debtor's budget as reflected in her Schedule J and her testimony leads to the inescapable conclusion that she spends well below accepted national standards for allowable living expenses. *See* Internal Revenue Service, U.S. Dept. of the Treasury, National Standards for Allowable Living Expenses, at *www.irs.gov/plain/ind.* Moreover, the Congressional intention of the earned income tax credit is to provide an incentive to low income working individuals and families to remain in the workforce by providing them with additional disposable income to improve the quality of their lives, not to pay a fifteen year old debt.

Nor do I see a legal vehicle that enables Debtor to compel her nineteen year old daughter to remain a resident in her home and contribute to the family budget. While she has in the past made contributions, they have been sporadic as has the daughter's employment status. The daughter pays for her telephone line, the one item in the budget which is unnecessary to the support of the Debtor and her dependent daughter. Other than housing for which there is no incremental cost it does not appear from the budget that Debtor expends any of her income to support this adult child.

■ (2) The second prong of the test requires me to determine whether additional circumstances exist indicating that this state of affairs is likely to persist for the significant portion of the repayment period for Debtor's student loan. This standard was recently further explained by the Third Circuit is as follows:

> This is a demanding requirement. As we indicated in *Faish,* it is not enough for [a debtor] to demonstrate that she is currently in financial straits; rather, she must prove "a total incapacity

---

**8.** The Earned Income Tax Credit ("EITC"), sometimes called the Earned Income Credit, is a refundable federal income tax credit for low-income working individuals and families. Congress originally approved the tax credit legislation in 1975 in part to offset the burden of social security taxes and to provide an incentive to work. The credit reduces the amount of federal tax owed and can result in a refund check. When the EITC exceeds the amount of taxes owed, it results in a tax refund to those who claim and qualify for the credit. Internal Revenue Service, The Digital Daily, EITC Overview, www.irs.gov/individuals/article.

... in the future to pay [her] debts for reasons not within [her] control." *Id.* at 307 (*quoting In re Brunner,* 46 B.R. 752, 758 (S.D.N.Y.1985)). In other words, "dischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment." *Brunner,* 46 B.R. at 755 (*quoting In re Briscoe,* 16 B.R. 128, 131 (Bankr.S.D.N.Y.1981)); *see also In re Ballard,* 60 B.R. 673, 675 (Bankr.W.D.Va.1986) (explaining that "[a] finding of undue hardship is reserved for the exceptional case and requires the presence of unique or extraordinary circumstances which would render it unlikely that the debtor ever would be able to honor his obligations").

*Brightful,* 267 F.3d at 328–29. Debtor's circumstances demonstrate more than a present inability to fulfill a financial commitment. Debtor uses all her disposable income to pay her basic living expenses. There is no cushion on her budget for emergencies. Her house still needs basic repair such as the toilet facilities, the dryer connection. Her earning capacity has been established based on her ten years of work history. She has been continually employed for the past ten years and her earnings have averaged $8.50 per hour as a nursing assistant, clerk or housekeeper. Her present wage is $8.00 per hour. While Debtor is trained and certified as a nursing assistant, her job prospects are unlikely to result in a higher wage than the wage she has been earning for the last ten years in other capacities that pay essentially the same. While the nursing assistant job may pay slightly more, the job openings do not exist. Thus, I find no basis to conclude that Debtor's financial situation will improve, but rather by reason of the termination of certain welfare benefits will likely deteriorate. With the loss of food stamps, Debtor will have to allocate more of her budget to food. With the loss of her health insurance, she may be forced to join other working poor who are uninsured. In short, Debtor has met her burden even under the vigorous articulation of the second prong in *Brightful.*

(3) The thrust of DOEd's case goes to the third prong of the *Faish* test, whether Debtor has made good faith efforts to repay the loan. In the five to seven years following the extension of the loan, Debtor was not working regularly and received welfare. During that period, she made no payments towards the loan. When she gained steady employment, she entered into a federal direct consolidation loan and made payments thereunder for three years.[9] She stopped because she simply could not afford to make them and keep up with her other expenses.

In *Williams v. Illinois Student Assistance Comm.,* 1999 WL 1134772, at *2 (Bankr.E.D.Pa. Dec.6, 1999) (*citing Great Lakes Higher Education Corp. et al. v. Brown (In re Brown),* 239 B.R. 204, 209 (S.D.Cal.1999)), I recognized that courts have not construed the good faith requirement to mandate that payments must have been made when they have been satisfied that the debtor's circumstances made such payment impossible.[10] In *Williams,* the debtor had made no payments on the loan. Debtor here has made an effort over a

---

9. She testified that she made payments prior to the consolidation but that testimony was apparently inconsistent with her deposition testimony. Nor is the record clear when those payments ceased. They commenced in April 1999 and continued into 2001.

10. DOEd's citation to *In re Pelliccia,* 67 Fed. Appx. 88 (3d Cir.2003), an unpublished, non-precedential case written "only for the parties" and therefore silent as to its facts, does not suggest otherwise. While the Court stated that good faith efforts to repay the loan

three year period only abandoning the payment plan in 2001 when she realized that she was making no inroads into the debt and incurring more debt from her reduced disposable income. Her bankruptcy case was filed in 2002 to address her obligations under the loan as well as other financial problems.

■■■ Finally the DOEd contends that the Debtor's efforts to repay the loan are not in good faith because of her failure to enter into an income contingent repayment plan[11] offered by the government. 34 C.F.R. § 685.208(f). The income contingent plan was recently summarized as follows:

> [A] borrower may qualify for an Income Contingent Repayment Plan, where the amount of the required monthly payment is recalculated yearly based on the borrower's Adjusted Gross Income, family size and the "poverty guidelines" promulgated by the United States Department of Health and Human Services. The repayment period covers a maximum of 300 months. The amount of payments are dependent on the borrower's income and payment may not be required at all during times when the borrower has little income. The balance remaining after the 300–month period is deemed forgiven.

*In re England,* 264 B.R. 38, 44 (Bankr.D.Idaho 2001). While a borrower with a low income may not have to make

any payments, the loan will continue to accrue interest and her income will be reviewed annually for 25 years should there be any improved payment capacity. The DOEd appears to view this program as the least restrictive alternative and its availability to negate the possibility that a failure to discharge a student loan obligation could ever be an "undue hardship."[12] After all, if the low income is maintained, the debtor will not have to make any repayments and eventually, *i.e.,* in 25 years, she will be discharged of this debt. That wait and see approach was rejected by the Court in *In re Ford,* 269 B.R. 673 (8th Cir. BAP 2001), where the court noted that the Student Loan Guarantee Fund was "merely hoping that the debtor might have greater income at some point in the next 25 years to permit her to make payments on her student loan." *Id.* at 677–78. This argument loses sight of Congress' intent that bankruptcy relief provide the debtor with a fresh start. It is long and frequently recognized that a central purpose of the Bankruptcy Code is to provide a procedure by which the poor but honest debtor can reorder his affairs, make peace with his creditors, and enjoy "a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). *Accord Insurance Co. of America v. Cohn (In re Cohn),* 54 F.3d 1108, 1113

must begin when the loan is first due, that holding does not conflict with the principle that the inability to make payments at any time does not suggest bad faith.

**11.** This plan is but one of four plans offered as part of the "William D. Ford Federal Direct Loan Program." *See* 34 C.F.R. Part 685. The other plans are the standard repayment plan and the extended repayment plan which require a monthly minimum payment of $50 and the graduated payment plan which requires a $25 minimum initially but increasing

every two years. DOEd does not contend that Debtor has the ability to perform any of these plans.

**12.** In *Newman v. Educational Credit Management Corp.,* Adv. No. 01–0271 (Bankr.E.D.Pa. Jan. 7, 2002), my colleague Chief Judge Fox refused to grant summary judgment which was based on that contention, stating that failure to enter into such a program is but one factor for the court to consider when making a good faith determination.

(3d Cir.1995) ("The overriding purpose of the Bankruptcy Code is to relieve debtors from the weight of oppressive indebtedness and provide them with a fresh start."). Retention of this now ten year old debt for another twenty-five years with the speculative hope that the Debtor's financial circumstances will improve runs counter to this legislative principle. Moreover, this approach would all but eviscerates § 523(a)(8) since the good faith finding which is required under *Faish* would always elude a debtor who did not opt for this program.

The better view is the one adopted by other courts, including this Court in *Newman, see supra* n. 12, that failure to participate in a repayment plan is but one factor that a court should consider in making its good faith determination based on the totality of the circumstances. *See, e.g., Ford,* 269 B.R. at 677; *In re England,* 264 B.R. at 50; *In re Standfuss,* 245 B.R. 356, 361 (Bankr.E.D.Mo.2000). Here the Debtor has not sought to take advantage of any of the DOEd's repayment programs because she sees no possibility of having disposable income that could be allocated for that purpose. Her prior attempt to engage in a loan repayment program only exacerbated her financial duress. Making minimal $20 monthly payments to DOEd for part of the year, which she did for three years, resulted in new unpaid obligations for her current living expenses. Indeed during this period, she defaulted on her car loan and lost her vehicle. There appears to be no prospects that she will be able to resume payments in the future. Her employment is steady now and that has not made a difference. While she has earned as much as $17,000 the year she worked at the Doubletree, that too did not make a difference and in any event she has been unable to replicate that income. The only other anticipated change is her younger daughter's graduation from high school in three years. Hopefully at that time Debtor can gain some relief in her exceedingly thin budget that makes no allowance for health insurance or medical care, and little allowance for food and recreation. These facts outweigh Debtor's failure to participate in the contingent income repayment plan and compel the conclusion that the third *Faish* factor is also satisfied.

An Order consistent with the foregoing Memorandum Opinion shall issue.

### ORDER

**AND NOW,** this 3rd day of July 2003, upon consideration of the Complaint of the debtor Waynette Alston ("Debtor") to determine the dischargeability of a student loan pursuant to 11 U.S.C. § 523(a)(8), and the Defendant Department of Education ("DOEd") contesting the discharge, after notice and trial, and for the reasons stated in the foregoing Memorandum Opinion:

It is hereby **ORDERED** and **DE-CREED** that judgment is Granted for Debtor. The student loan obligation is **DISCHARGED.**