**BURLINGTON NORTHERN RAILROAD COMPANY, Plaintiff,**

v.

**SOO LINE RAILROAD COMPANY, Defendant.**

Civ. No. 4–93–55.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 13, 1993.

Timothy R. Thornton, Scott G. Bowman, Briggs & Morgan, Minneapolis, MN, for plaintiff.

Wayne C. Serkland, Patrick J. Nugent, Minneapolis, MN, for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendant's motion for partial summary judgment and motion for a preliminary injunction. Both motions will be granted.

## FACTS

### I. *1902 Agreement*

On May 28, 1902, the Chicago, Milwaukee & St. Paul Railway Company (Milwaukee) and the Chicago, Burlington & Quincy Railway Company (CB & Q) entered into an agreement to combine their individual single tracks between St. Paul, Minnesota and St. Croix Junction, which is near Hastings, Minnesota, to create a double or paired track arrangement. Pursuant to the 1902 agreement, an intersection of the tracks near Newport, Minnesota was removed and the two tracks became a jointly used double main line track, operated and maintained for the common benefit of the two railroads.

Three provisions of the 1902 agreement are particularly relevant to this litigation. First, Article II, section 1 details the parties' rights and obligations. Specifically, it provides:

Each party hereto hereby grants to the other, for the purposes of this agreement and during the continuance thereof but not otherwise or longer, an easement for *all railway uses and purposes*, upon and over all parts of its own main track aforesaid, which are to form as aforesaid part and parcel of such double tracks; and the said parties hereby mutually covenant and agree to arrange, construct and connect their said tracks as aforesaid, and during the continuance of this agreement to hold, maintain and operate the same and all parts thereof between said St. Croix Junction Crossing and said Union Depot connections, and all the aforesaid additions to and connections between them which are, as aforesaid, not designed for the exclusive benefit of either, in common as double track line of railway, and as hereinafter further provided.

Affidavit of Scott G. Bowman Exh. G Art. II, § 1 (emphasis added).

Second, Article VI, section 3 prohibits any assignment of rights under the agreement without written consent. Specifically, it provides:

Neither party hereto shall without the written consent, or other written concurrence, of the other party, sell or in any manner assign or transfer this agreement or any right or privilege under or by it granted, or permit any person or persons, company or companies, to share any such right or privilege; this agreement shall however during the continuance thereof attach to and run with the railways of the respective parties and be binding upon and inure to the benefit of any railway company which shall during such continuance own or operate either such railway.

Bowman Aff.Exh. G Art. VI, § 3.

Third, Article VII, section 1 calls for the arbitration of disputes which arise under the

agreement. The arbitration provision provides:

*If at any time a question shall arise touching the construction of any part of this contract,* or concerning the business or manner of transacting the business carried on under the provisions hereof, or concerning the observance or performance of any of the conditions herein contained, upon which question the parties hereto cannot agree, *such question shall be submitted to the arbitrament of three (3) disinterested persons to be chosen, one by the St. Paul Company, one by the Quincy Company, and the other by the two so chosen.* The party desiring such arbitration shall select its arbitrator and give written notice thereof to the other party, and shall in such notice state precisely the matter or matters which it proposes to bring before the arbitrators; and only the matters so stated shall be considered or decided by them.... *Until the arbitrators shall make their award upon any question submitted to them, the business, settlements and payments to be transacted and made under this agreement shall continue to be transacted and made in the manner and form existing prior to the rise of such question.*

Bowman Aff.Exh. G Art. VII, § 1 (emphasis added).

In 1970, CB & Q merged with the Great Northern Railroad and the Northern Pacific Railroad to form what is now plaintiff Burlington Northern Railroad (BN). Pursuant to the merger, BN succeeded to CB & Q's rights and obligations, including those under the 1902 agreement.

## II. *Bankruptcy of the Milwaukee Railroad*

In 1977, the Milwaukee filed for bankruptcy. After filing for bankruptcy, the Milwaukee continued to sustain substantial losses. At that point Congress stepped in and passed the Milwaukee Railroad Restructuring Act (MRRA), 45 U.S.C. § 901, *et seq.*, in 1979. Among other things, the MRRA provides that the Interstate Commerce Commission (ICC) must approve the sale of any of the Milwaukee's railroad assets and the bank-

ruptcy court must then review the ICC's decision to determine whether to implement the approved sale. 45 U.S.C. § 904(b)(1)–(2). In September 1984, the ICC approved the proposal of defendant Soo Line Railroad Company, a subsidiary of the Canadian Pacific Railroad Company, to purchase the railroad operations of the Milwaukee and to assume the Milwaukee's liabilities. On February 19, 1985, the United States District Court for the Northern District of Illinois approved the sale to Soo Line. In its order confirming the sale, known as Order No. 809, the court specifically addressed the issue of the assignment of all of the Milwaukee's contracts to Soo Line. The order provides that:

The sale of Rail Assets and the assignment and assumption of the trackage agreements, joint facilities and operating rights over segments of the rail properties now operated by the Trustee are in the public interest (as determined by the Commission and affirmed by this Court) and are in the best interest of the estate as found by this Court. *The assignment and assumption of the trackage agreements, interests in or agreements with respect to joint facilities, leases, operating rights and all other rights and interests of the Trustee being assigned pursuant to the APA [asset purchase agreement] will not effect a termination of the Trustee's rights and interests under the contracts, leases and agreements granting those rights and interests, and those rights and interests are ~~fully~~ assignable to Soo and SLRCO in accordance with the terms of the APA, and notwithstanding any provisions in any such contracts, leases or agreements to the contrary.*

Affidavit of Wayne C. Serkland Exh. H ¶ 9 at 6–7 (strikeout in original, emphasis added).

## III. *October 1988 Lease*

On October 15, 1988, more than three years after the Milwaukee reorganization court approved the assignment of all contracts to Soo Line, Soo Line and BN entered into a lease agreement designed to clarify obligations for maintenance on a portion of the paired track. Affidavit of Lowell E. Sandstrom ¶ 5. Among other things, the

lease provides that "[n]otwithstanding anything to the contrary contained herein, this agreement shall be subject to the terms, covenants and conditions of that certain joint operating agreement dated May 28, 1902 by and between the parties hereto, or their predecessors, and by which by reference is made a part hereof." Serkland Aff.Exh. I ¶ 21.

## IV. *BN's Agreement with the Canadian National Railway Company*

In September 1992, BN and the Canadian National Railway Company (CN) entered into a haulage agreement. The haulage agreement established the right of CN to run its trains in BN's rail corridor between Superior, Wisconsin and Chicago, Illinois. To fulfill its obligations under the haulage agreement, BN exchanges traffic with CN and moves this exchanged traffic over the double tracks covered by the 1902 agreement. No trains moving over these tracks are operated by CN personnel.

Soo Line's parent, Canadian Pacific, and CN are fierce competitors. In November 1992, Soo Line learned about BN's haulage agreement with CN. Soo Line immediately complained that the deal violated the terms of the 1902 agreement. On December 22, 1992, Soo Line served BN with a notice of demand for arbitration of the dispute. BN responded by filing this declaratory judgment action on January 19, 1993. BN seeks a ruling that it has no duty to arbitrate and a declaration of its rights and obligations under the 1902 agreement. On February 17, 1993, BN moved for a preliminary injunction to halt the arbitration process. On March 8, 1993, the Court held a conference in chambers at which time the parties agreed to put the arbitration process on hold until the Court had an opportunity to address the merits of this action.

## DISCUSSION

This litigation presents two issues: (1) whether BN has an obligation to arbitrate the underlying dispute over trackage rights; and (2) if BN is not obligated to arbitrate the underlying dispute, what are the rights and obligations of the parties concerning trackage use. Soo Line has now moved for summary judgment on the arbitration issue.

Moreover, regardless of the Court's ruling on the arbitration issue, Soo Line seeks a preliminary injunction preventing BN from continuing to carry CN traffic over the paired trackage pending resolution of the underlying dispute, whether it be by the arbitration panel or the Court.

## I. *Soo Line's Motion for Partial Summary Judgment on Duty to Arbitrate*

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing,* 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The question presented is whether the 1902 agreement's arbitration provision binds BN even though BN never consented to the assignment of that specific provision to Soo Line.

## A. *Res Judicata and Constitutional Considerations*

█ Soo Line argues that the doctrine of res judicata bars BN from claiming that Order No. 809 did not effectively assign the entire 1902 agreement, including the arbitration provision, to Soo Line. Soo Line points out that Order No. 809 provides that all of the Milwaukee's contracts, and all rights and obligations under those contracts, would be assigned to Soo Line, even if the contracts were written to prohibit such an assignment.

To support its res judicata argument, Soo Line directs the Court to *Seaboard System Railroad, Inc. v. Soo Line Railroad, Co.* The facts of that case were as follows. In 1971, the Louisville & Nashville Railroad (L & N), the predecessor of Seaboard, merged with the Monon Railroad. The ICC approved the merger on the condition that L & N grant the Milwaukee Railroad certain trackage rights to operate in Indiana. The basis for the ICC requirement was to offset the anticipated anticompetitive effects of the merger. The agreement approved by the ICC provided that the Milwaukee could not transfer the trackage rights without L & N's written consent. Another provision of the agreement called for arbitration of disputes. After the Milwaukee filed for bankruptcy in 1977 and the ICC approved the sale of its railroad assets to Soo Line, Seaboard intervened in the reorganization proceeding in Illinois and argued that the reorganization court was without authority to transfer the trackage rights to Soo Line because Seaboard had not consented to that transfer. The reorganization court disagreed and issued Order No. 809, referred to above.

While the appeal of Order No. 809 was pending, Seaboard filed suit in the Northern District of Georgia seeking a declaratory judgment on the issue of whether Soo Line would be entitled to the trackage rights Seaboard had transferred to the Milwaukee. The ICC and the United States intervened in the Georgia proceeding. The ICC and Soo Line then moved to dismiss on the basis of res judicata. In an unpublished opinion dated May 28, 1986, the Georgia district court noted that Order No. 809 was a final judgment and that Seaboard had been involved in the proceeding before the reorganization court in Illinois. The court also concluded that the same cause of action was involved in both suits. Accordingly, the court dismissed Seaboard's action as barred by res judicata.

In the case at bar, Soo Line argues that res judicata likewise bars BN's argument that the arbitration provision of the 1902 agreement could not be assigned to Soo Line without BN's consent. Soo Line points out that BN participated in the Milwaukee's reorganization proceedings and argues that BN is asking the Court to disregard what was already decided by Order No. 809.

BN argues that res judicata does not bar it from contesting the assignment of the arbitration provision. Although BN admits to making appearances in the Milwaukee bankruptcy, it asserts that because it was not officially a party to the reorganization proceeding it cannot be bound by Order No. 809. BN also argues that this action is not barred by res judicata because it does not involve the same claim raised in connection with Order No. 809. BN contends that Order No. 809 contemplated only the assignability of trackage rights, not the assignability of arbitration provisions. BN points out that Order No. 809 states that the Milwaukee's "rights and interests are ~~fully~~ assignable to Soo," and argues that because the court struck the word fully, it must have intended that Soo Line would take something less than a "full" assignment of the Milwaukee's rights under the various contracts. According to BN, such an interpretation of Order No. 809 is logical because an assignment of trackage rights furthers the intent of the MRRA, but an assignment of arbitration provisions does not.

To support its argument that the Milwaukee's right to arbitration was not assigned to Soo Line, BN directs the Court to *Matter of Chicago, Milwaukee, St. Paul, and Pac. Railroad Co.*, 789 F.2d 1281 (7th Cir.1986) (*Escanaba*). In that case, the Escanaba &

Lake Superior Railroad Company had an agreement with the Milwaukee that granted the Escanaba a right of first refusal to purchase a certain line of track. The agreement also contained an arbitration clause. After the Milwaukee filed for bankruptcy, Escanaba eventually acquired the line. However, Escanaba then demanded arbitration with the Milwaukee for damages caused by the delay in transferring the line. The Milwaukee asked the district court for a declaratory judgment that the demand to arbitrate pretransfer damages had been transferred to Soo Line under Order No. 809. The district court refused to grant this relief, writing:

> We do not understand any theory by which the Trustee [of the Milwaukee] can transfer to the Soo Railroad his obligation to arbitrate *unless the [Escanaba] agrees and the Soo Railroad assumes the obligation.* These voluntary acts have presumably not been taken....

789 F.2d at 1282 (emphasis added). On appeal, the United States Court of Appeals for the Seventh Circuit held that the "voluntary acts" to which the district court referred had in fact occurred because Soo Line had voluntarily acquired the Milwaukee's liabilities. Thus, the court reversed the district court and held that when the Milwaukee sold its rail assets to Soo Line, it transferred the duty to arbitrate as well. The Seventh Circuit, unlike the district court, did not state that Escanaba had to agree to the transfer. Nevertheless, BN argues that *Escanaba* establishes that Order No. 809 did not result in an assignment of the duty to arbitrate to Soo Line. BN maintains that because the Seventh Circuit did not explicitly contradict the district court's statement that Escanaba had to agree to assignment of the arbitration provision, the Seventh Circuit implicitly adopted it and silently concluded that Escanaba had in fact consented.

Finally, BN argues that to the extent that Order No. 809 is read to include a nonconsensual transfer of a duty to arbitrate, application of Order No. 809 to the 1902 agreement is unconstitutional because it infringes on BN's Seventh Amendment right to a jury trial. BN asserts that it cannot be deprived of a right to a jury trial without due

process of law and argues that the notice it received in connection with Order No. 809 did not satisfy due process.

The Court concludes that under the unambiguous terms of Order No. 809, the entire 1902 agreement, including the arbitration provision, was assigned to Soo Line despite the fact that BN did not consent. The terms of Order No. 809 are not limited to the assignment of trackage rights; rather, it provided that all "trackage rights agreements" and all "rights and interests" under those agreements, would be assigned to Soo Line, even if those agreements purported to forbid such an assignment.

The next issue which the Court must address is whether BN may collaterally attack Order No. 809's assignment of the entire 1902 agreement, including the arbitration provision, to Soo Line. The Court finds that BN cannot raise such a collateral attack. "The doctrine of res judicata bars relitigation of a claim if three requirements are met: (a) the prior judgment was rendered by a court of competent jurisdiction; (b) the prior judgment was a final judgment on the merits; and (c) the same cause of action and the same parties or their privies were involved in both cases." *Murphy v. Jones,* 877 F.2d 682, 684 (8th Cir.1989). BN does not dispute that requirements (a) and (b) have been satisfied. The sole question is whether, for res judicata purposes, the two actions involved the same cause of action and the same parties or their privies.

First, the Court finds that the same cause of action is involved in this case. The Court is unpersuaded by BN's argument that because Order No. 809 states that the Milwaukee's "rights and interests are ~~fully~~ assignable to Soo," the reorganization court must have intended something less than a full assignment and expected subsequent litigation to determine the scope of the assignment. In addition, BN's reliance on *Escanaba* is misplaced. BN relies on the district court's statement to the effect that, Order No. 809 notwithstanding, both parties under a contract must agree to the transfer of the obligation to arbitrate. However, the only issue addressed by the Seventh Circuit was whether Soo Line had assumed the Milwau-

kee's obligation to arbitrate. The court held that Soo Line had voluntarily assumed that obligation by taking over all of the Milwaukee's liabilities. The Seventh Circuit never stated that it was necessary for Escanaba to consent to a transfer of the duty to arbitrate. Accordingly, the Court concludes that the Seventh Circuit implicitly rejected the district court's finding that Escanaba's consent was required.

Second, the Court concludes that the fact that BN was not officially a party to the Milwaukee reorganization does not mean that it is free to collaterally attack Order No. 809. The general rule is that for res judicata purposes, the word "parties" does not refer to formal or paper parties, but to parties in interest, that is, persons whose interests are placed before the court by someone with standing to represent them. *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 869 (5th Cir.1984) (citing 1B J. Moore, *Moore's Federal Practice* ¶ 0.411[1] at 390–91 (2d ed. 1983)). By participating in reorganization proceedings, BN could become a party to them for res judicata purposes, regardless of whether it formally intervened. *Southmark Properties*, 742 F.2d at 870.

The evidence clearly establishes that BN participated in the Milwaukee's reorganization proceedings and was heard. In fact, in a brief BN submitted to the Seventh Circuit on an appeal in the reorganization, BN begins its introduction by stating that "Burlington Northern participated in the railroad reorganization proceedings before the Honorable Thomas R. McMillen, United States District Court for the Northern District of Illinois, as well as the underlying Interstate Commerce Commission (Commission) proceedings instituted on referral from the District Court." Supplemental Affidavit of Wayne C. Serkland Exh. A at 2. Moreover, in Order No. 809 the court wrote that it had "considered the evidence adduced, the arguments of counsel, and the oral and written applications of various parties in interest ... including those of ... Burlington Northern Railroad Company." Order No. 809 ¶ 3 at 2. BN did not object to the assignment of all terms and conditions of the 1902 agreement to Soo Line at that time. The Court concludes that it would be inappropriate to allow BN to raise objections now.

■ Finally, the Court holds that requiring BN to arbitrate this dispute does not infringe on its Seventh Amendment right to a jury trial. Supreme Court precedent indicates that the Seventh Amendment does not present a serious obstacle to arbitration. In fact, that precedent makes clear that arbitration clauses are to be broadly construed and doubts are to be resolved in favor of arbitration. *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649–51, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960). If the Seventh Amendment presented a serious limitation on the duty to arbitrate, arbitration provisions would have to be narrowly construed.

For all of these reasons, the Court concludes that the doctrine of res judicata bars BN's challenge to the assignment of the arbitration provision.

### B. *The October 1988 Lease Between BN and Soo Line*

■ Soo Line argues that even if Order No. 809 did not bar BN's claim, BN explicitly reaffirmed the continued enforceability of the 1902 agreement after Order No. 809 was issued. Soo Line points to the lease agreement between Soo Line and BN which is dated October 15, 1988. That lease was designed to clarify obligations for maintenance on a portion of the paired track and provided that "[n]otwithstanding anything to the contrary contained herein, this agreement shall be subject to the terms, covenants and conditions of that certain joint operating agreement dated May 28, 1902 by and between the parties hereto, or their predecessors, and by which by reference is made a part hereof." Serkland Aff.Exh. I ¶ 21. Soo Line argues that this lease agreement establishes that BN clearly expected and intended that all terms of the 1902 agreement would continue in force after the assignment to Soo Line.

BN disputes that the October 1988 lease indicates an intent to adopt the 1902 agree-

ment. BN maintains that reference to the 1902 agreement in the October 1988 lease does not result in BN being bound by all provisions of the 1902 agreement. BN argues that because the lease does not specifically refer to the arbitration provision of the 1902 agreement, the lease cannot serve as evidence that BN adopted that specific provision.

Even if the Court was not convinced that Order No. 809 conclusively settled the arbitration issue, the October 1988 lease strongly indicates that BN expected and intended that all terms and conditions of the 1902 agreement remained in effect after Order No. 809 was issued. The lease was designed to supplement the 1902 agreement and it incorporated the entire 1902 agreement by reference. The Court concludes that by incorporating the terms and conditions of the 1902 agreement into a lease designed to supplement that agreement, BN effectively admitted that all terms and conditions of the 1902 agreement, including the arbitration provision, had been properly assigned to Soo Line. *See U.S.F. & G. Co. v. West Point Construction Co., Inc.,* 837 F.2d 1507 (11th Cir.1988); *Knut Co. v. Knutson Construction Co.,* 433 N.W.2d 149, 151 (Minn.Ct.App.1988), *aff'd,* 449 N.W.2d 143 (Minn.1989); 5 Am.Jur.2d *Arbitration and Award* § 16 (1962).

### C. *Validity and Enforceability*

 BN claims that even if the arbitration clause was properly assigned to Soo Line, the clause is nevertheless invalid and unenforceable. BN argues that the law of 1902 is the part of the contract and thus arbitration jurisprudence of that era should be applied to determine the enforceability of the provision. BN points out that in 1902, unlike today, courts disfavored arbitration. BN also asserts that under the law of 1902, strict statutory formalities had to be complied with to make an arbitration provision enforceable. Specifically, BN maintains that in 1902 an arbitration agreement was not enforceable unless it had been signed before a justice of the peace and the agreement named who the arbitrators would be. BN asserts those formalities were not satisfied in

this case and thus the provision is unenforceable.

It would be impractical for the Court to endeavor to apply the arbitration statutes in effect in 1902 and attempt to determine whether the original parties to the 1902 agreement complied with those formalities. However, even if the law required such an analysis in the ordinary case, it is not necessary in this case. The October 1988 lease specifically incorporated all of the terms and conditions of the 1902 agreement. Under the law in effect in 1988, an arbitration agreement need not be signed before a justice of the peace and need not name the arbitrators. In short, the Court finds that the arbitration provision is enforceable even if the original parties to the 1902 agreement did not comply with strict statutory formalities in place at that time.

### D. *Waiver*

 Finally, BN asserts that Soo Line has waived any arbitration rights that it may have had by actively participating in this lawsuit. More specifically, BN asserts that Soo Line has made extensive discovery requests and deposed numerous BN employees seeking information beyond the scope of the issue it seeks to have arbitrated. BN also argues that Soo Line's motion for a preliminary injunction is inconsistent with the claimed right to arbitration because it requires the Court to address the merits of the underlying dispute. BN claims to have been prejudiced by Soo Line's actions in this litigation because it has incurred substantial expenses responding to the discovery requests, and because it has been required to turn over trade secret information which Soo Line would not have access to in an arbitration proceeding. Finally, BN argues that the case is ready for trial and thus there are no efficiency advantages to requiring arbitration.

 The Court concludes that Soo Line has not waived its right to arbitration. A party waives its right to arbitration if it (1) knew of an existing right to arbitration, (2) acted inconsistently with that right, and (3) prejudiced the other party by these inconsistent acts. *Ritzel Communications, Inc. v.*

*Mid–American Cellular Telephone Co.,* 989 F.2d 966, 969 (8th Cir.1993). However, "[a]ny examination of whether the right to compel arbitration has been waived must be conducted in light of the strong federal policy favoring arbitration for dispute resolution." *Rush v. Oppenheimer & Co.,* 779 F.2d 885, 887 (2d Cir.1985). "[I]n view of the strong federal policy in favor of arbitration, 'any doubts concerning . . . waiver, delay, or a like defense to arbitrability' should be resolved in favor of arbitration." *Nesslage v. York Securities, Inc.,* 823 F.2d 231, 234 (8th Cir.1987) (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 23–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)).

In this case, the delay in proceeding to arbitration has been caused by BN. In November 1992, Soo Line learned about BN's haulage agreement with CN. Soo Line immediately complained that the deal violated the terms of the 1902 agreement and on December 22, 1992, Soo Line served BN with a notice of demand for arbitration of the dispute. BN responded to that notice by filing this action. Moreover, Soo Line's participation in discovery does not serve as sufficient grounds to find that it has waived its right to arbitration. At the March 8, 1993, conference in chambers, the Court directed the parties to complete discovery and then bring the appropriate motions. It would be fundamentally unfair to now hold that by participating in discovery, Soo Line waived its right to arbitration. Finally, as the next section will make clear, the Court does not believe that Soo Line's motion for a preliminary injunction requires the Court to address the merits of the dispute and thus the preliminary injunction motion is not inconsistent with a demand for arbitration.

## II. *Preliminary Injunction*

■ Regardless of the Court's ruling on the arbitration issue, Soo Line seeks a preliminary injunction preventing BN from continuing to carry CN traffic over the paired trackage pending resolution of the underlying dispute, whether it be by an arbitration panel or the Court. The 1902 agreement provides that "[u]ntil the arbitrators shall

make their award upon any question submitted to them, the business, settlements and payments to be transacted and made under this agreement shall continue to be transacted and made in the manner and form existing prior to the rise of such question." Bowman Aff Exh. G Art. VII, § 1. Soo Line asserts that the only issue is whether, pending resolution of the underlying dispute, it is entitled to an order requiring specific performance of this provision. Soo Line argues that because the 1902 contract involves real property, and because real property contracts are often specifically enforced, it is entitled to specific performance in this case.

Soo Line further contends that BN knew from the start that if Soo Line objected to the BN/CN haulage agreement and demanded arbitration, the haulage agreement would have to be suspended, at least temporarily. Soo Line directs the Court's attention to a supplemental letter agreement between BN and CN dated September 25, 1992. The letter agreement provides that:

> This letter agreement constitutes the binding commitment of each our companies to a course of action in the event Soo Line contends that its consent is required by virtue of . . . [the 1902 agreement] prior to the provision of haulage services. . . .
>
> . . . . BN agrees to commence haulage services in accordance with the Haulage Agreement, and agrees to continue provision of such services until and *unless it is enjoined or prevented from providing such services by a court order or by the commencement of arbitration.*

Serkland Aff.Exh. C at 1 (emphasis added). Soo Line asserts this supplemental agreement establishes that BN understood that the institution of arbitration alone would be enough to require them to discontinue CN train operation over the paired track and this is why BN has gone to great lengths to avoid arbitration in this matter.

BN responds by arguing Soo Line is not entitled to specific enforcement of the provision in the 1902 agreement quoted above. BN relies in large part on *Merrill Lynch, Pierce, Fenner & Smith v. Hovey,* 726 F.2d 1286 (8th Cir.1984). In *Hovey,* several account executives left Merrill Lynch and

joined a competitor, taking numerous client files with them. Merrill Lynch sought injunctive relief to prevent the employees from using the client files and the employees counterclaimed seeking to compel arbitration. The district court granted the preliminary injunction and denied the employees' motion to compel arbitration. The United States Court of Appeals for the Eighth Circuit reversed both rulings. The court found that arbitration was available because Merrill Lynch and the employees were members of the NYSE and as members they agreed to comply with all NYSE rules, one of which provided for the arbitration of all disputes. The court then held that it was an abuse of discretion for the district court to issue an injunction. The court concluded that an injunction was inappropriate because there was no allegation that the contracts contemplated temporary injunctive relief and because the inquiry necessary to determine the appropriateness of injunctive relief would inject the court into the merits of issues more appropriately left to the arbitrator.

The Court concludes that because Soo Line is entitled to summary judgment on the arbitration issue, Soo Line is also entitled to injunctive relief based on the contract's terms. BN cites *Hovey* for the proposition that preliminary relief is inappropriate when the underlying dispute is arbitrable. While this is the general rule, "*Hovey* leaves open the possibility of a court's entering a preliminary injunction where the parties had contemplated its use beforehand." *RGI, Inc. v. Tucker & Associates, Inc.*, 858 F.2d 227, 230 (5th Cir.1988). If the contract contemplates preliminary injunctive relief, the rationale of *Hovey* does not apply because "the court need not involve itself in balancing the various factors to determine whether a preliminary injunction should be issued." *Id.* The 1902 agreement provides that "[u]ntil the arbitrators shall make their award upon any question submitted to them, the business, settlements and payments to be transacted and made under this agreement shall continue to be transacted and made in the manner and form existing prior to the rise of such question." Bowman Aff.Exh. G Art. VII, § 1. Soo Line is entitled to injunctive relief based on this contract language and the

Court need not even discuss the traditional factors for preliminary relief. In short, the Court can issue a preliminary injunction without injecting itself into issues more appropriately left to the arbitration panel. *See Hovey*, 726 F.2d at 1292.

Accordingly, based on the foregoing, and upon all the files, records and proceedings herein,

**IT IS ORDERED** that:

1. Soo Line's motion for partial summary judgment is granted and this matter shall proceed to arbitration;

2. Soo Line's motion for a preliminary injunction is granted;

3. until the arbitration panel makes its award, the business transacted under the 1902 agreement shall return to the manner and form existing prior to the rise of this dispute; and

4. Soo Line shall post a security bond in the amount of $50,000 as required by Federal Rule of Civil Procedure 65(c).